4112

1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

3

4    UNITED STATES OF AMERICA,                    )
                                                  )
5                      Plaintiff,                 )
                                                  )
6    -vs-                                         )    Case No. 20 CR 812-1, -2,
                                                  )    -3, and -4
7    MICHAEL McCLAIN, ANNE                        )
     PRAMAGGIORE, JOHN HOOKER,                    )
8    and JAY DOHERTY,                             )    Chicago, Illinois
                                                  )    April 13, 2023
9                      Defendants.                )    9:53 a.m.

VOLUME 18-A
10                  TRANSCRIPT OF PROCEEDINGS - Trial
        BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury

11
12   APPEARANCES:

13   For the Government:      HON. MORRIS O. PASQUAL
                             ACTING UNITED STATES ATTORNEY
14                           BY:  MR. AMARJEET SINGH BHACHU
                                  MS. SARAH E. STREICKER
15                                MS. DIANE MacARTHUR
                                  MS. JULIA K. SCHWARTZ
16                           219 South Dearborn Street, Suite 500,
                             Chicago, Illinois  60604
17                           (312)353-5300

18   For Defendant          GREENSFELDER, HEMKER & GALE, PC
     McClain:               BY:  MR. PATRICK J. COTTER
19                               MR. DAVID P. NIEMEIER
                            200 West Madison Street
20                          Suite 3300
                            Chicago, Illinois  60606
21                          (312) 345-5088

22   Court Reporters:
                            JUDITH A. WALSH, CSR, RDR, F/CRR
23                               Official Court Reporters
                             United States District Court
24                             219 South Dearborn Street
                              Chicago, Illinois  60604
25                          Telephone:  (312) 435-5387
                           charles_zandi@ilnd.uscourts.gov

```
 1   APPEARANCES:   (Continued)

 2   For Defendant            SIDLEY AUSTIN, LLP
     Pramaggiore:             BY:   MR. SCOTT R. LASSAR
 3                                  MR. DANIEL C. CRAIG
                                    MS. JENNIFER M. WHEELER
 4                                  MS. EMILY A. ROSENBERG WOODRING
                              One South Dearborn Street
 5                            Chicago, Illinois  60603
                              (312) 853-7668
 6

 7   For Defendant Hooker:    MONICO & SPEVACK
                              BY:   MR. MICHAEL D. MONICO
 8                                  MS. JACQUELINE S. JACOBSON
                                    MR. RYAN W. MITSOS
 9                            20 South Clark Street
                              Suite 700
10                            Chicago, Illinois  60603
                              (312) 782-8500
11

12                            LAW OFFICES OF SUSAN M. PAVLOW
                              BY:   MS. SUSAN M. PAVLOW
13                            53 West Jackson Boulevard
                              Suite 1215
14                            Chicago, Illinois  60604
                              (312) 322-0094
15

16   For Defendant            LAW OFFICES OF GILLESPIE AND
     Doherty:                 GILLESPIE
17                            BY:   MR. MICHAEL P. GILLESPIE
                              53 West Jackson Boulevard
18                            Suite 1062
                              Chicago, Illinois  60604
19                            (312) 588-1281

20                            MS. GABRIELLE R. SANSONETTI
                              53 West Jackson Boulevard
21                            Suite 1062
                              Chicago, Illinois  60604
22                            (312) 588-1281

23

24

25
```

1    (Proceedings heard in open court.  Jury out.)

2            THE COURT:  What do you want to put on the record,

3    Ms. Schwartz?

4            MS. SCHWARTZ:  Julia Schwartz for the United States.

5    Your Honor, we had one matter we wanted to raise with regard

6    to Ms. Pramaggiore's character witnesses.  As your Honor

7    recalls, you granted yesterday in part the government's motion

8    regarding appropriate character evidence and limited it to

9    opinions as to honesty and integrity and excluded prior good

10   acts.  That was yesterday morning.

11           Yesterday, Ms. Pramaggiore's counsel presented a

12   number of character witnesses that, you know, exceeded the

13   bounds of your Honor's prior ruling, so we wanted to renew our

14   motion today and also raise one particular concern with a

15   witness who is anticipated to testify today.

16           That witness is Shantinel Laws.  Ms. Laws is a

17   manager at ComEd who came to know Ms. Pramaggiore in 2015 when

18   her daughter went missing.  Her daughter has been missing for

19   the last eight years.  Ms. Pramaggiore in her capacity as

20   ComEd's CEO supported Ms. Laws, told her she could keep her

21   job, checked in on her, etcetera.

22           We have a number of concerns about this witness in

23   particular, and we would ask the Court to exclude Ms. Laws as

24   a character witness.  First, your Honor did rule that the

25   pertinent traits at issue that are appropriate for character

1    witness testimony are honesty and integrity.

2    Ms. Pramaggiore's support of a ComEd employee who suffered a

3    significant --

4         THE COURT:  And also since she's going to testify,

5    truthfulness is one that she can testify to.

6         MS. SCHWARTZ:  Right, honesty, yes.

7         THE COURT:  Opinion.  So those three topics, but good

8    works are out.  I mentioned that.  And there were a couple of

9    instances where you were putting in good works.

10        MR. LASSAR:  Judge --

11        MS. SCHWARTZ:  And, your Honor, if I may, the

12   anticipated testimony of Ms. Laws, in our view, falls into

13   that good works category.  It's Ms. Pramaggiore supporting an

14   employee in a time of personal tragedy, checking in on her,

15   etcetera.  This testimony doesn't have to do with honesty,

16   truthfulness, integrity at least as we --

17        THE COURT:  It sounds like good works.

18        MS. SCHWARTZ:  And we agree.  And we also have a 403

19   concern.  It's potentially inflammatory and prejudicial given

20   the truly horrific nature of the tragedy this witness

21   suffered.  In addition, we also have some foundation concerns

22   insofar as to our understanding, Ms. Laws met Ms. Pramaggiore

23   in person only on a small handful of occasions.  Their

24   communications were not -- were text, phone, not based on

25   direct working interactions.

1           So for all those reasons, we view her testimony as

2   inappropriate and cumulative at this point.  We have something

3   like eight character witnesses for Ms. Pramaggiore lined up

4   yesterday and today even without Ms. Laws' testimony.

5           MS. STREICKER:  If I could just raise one other

6   thing, your Honor, the government did have an opportunity to

7   talk to Ms. Laws briefly.  She is represented by counsel.  She

8   was extremely emotional, understandably, during that

9   conversation.  So again, we just do have some --

10          THE COURT:  I'm not familiar with what the tragedy

11  is.

12          MS. STREICKER:  Her daughter went missing, your

13  Honor, I think it was about eight years ago, and is still

14  missing today.

15          THE COURT:  Mr. Lassar?

16          MR. LASSAR:  Judge, we would limit her testimony to

17  how she first met Anne which would require her to say, talk

18  about her daughter being missing.  We would keep out any

19  details about the further contacts and what Ms. Pramaggiore

20  did to help her find her daughter.  We wouldn't do any of

21  that, just to establish that she had further contacts and kept

22  in touch with her and then ask the character question.

23          THE COURT:  So how many contacts has she had?

24          MR. LASSAR:  Well, they kept -- they --

25          THE COURT:  She's going to opine as to honesty and

1    integrity?

2             MR. LASSAR:  Yes.

3             THE COURT:  Well, she should testify, you know, when

4    she met her and how many times -- contacts she's had.

5             MR. LASSAR:  Right.

6             THE COURT:  But she should not go into what the

7    reason for the contacts.

8             MR. LASSAR:  Well, we'll have -- she'll have to talk

9    about the original reason to explain how she met Anne, but

10   we -- after that, we won't go into what Anne did in regard to

11   her missing daughter.

12            THE COURT:  Okay.  That limited, I'll let you do

13   that.

14            MS. SCHWARTZ:  If I may, your Honor, would it be

15   possible to sanitize it in a way to allay 403 concerns by, for

16   example, asking a leading question, "Did you suffer a personal

17   tragedy in 2015?"

18            THE COURT:  Yes.  Make sure she doesn't -- I don't

19   know what -- the government claims apparently after contacting

20   her, she's very emotional, and we don't want emotion.

21            MR. LASSAR:  I can't -- I can't promise whether

22   she'll be emotional or not.  I don't know.

23            THE COURT:  Well, do the best -- probably by leading

24   questions.

25            MR. LASSAR:  Yes.

1    THE COURT:  Okay.

2    MS. STREICKER:  Your Honor, may we briefly raise one

3  additional issue if that's okay?

4    THE COURT:  Yes.

5    MS. STREICKER:  Thank you, your Honor.  We did want

6  to raise with you in light of Ms. Pramaggiore's decision to

7  testify and the fact that she may take the stand today, we did

8  want to raise with your Honor that Ms. Pramaggiore did come in

9  for a proffer with the government.

10    THE COURT:  Just a second.

11    (Pause.)

12    THE COURT:  Okay.  We're on.

13    MS. STREICKER:  Thank you, your Honor.

14    THE COURT:  Go ahead.

15    MS. STREICKER:  So as I was saying, in light of

16  Ms. Pramaggiore's decision to testify, we wanted to raise a

17  matter with the Court which is that Ms. Pramaggiore proffered

18  with the government.  That occurred on September 10th of 2019.

19  She was represented by Mr. Lassar and Mr. Craig at the time.

20  And at that point she had known about the investigation for

21  several months.

22    She entered into a standard proffer letter agreement

23  with the government, and there is an approximately 33-page FBI

24  302 documenting the proffer.  And I can tender copies to your

25  Honor, but we wanted to provide notice that if Ms. Pramaggiore

1  testifies or otherwise takes a position in the defense case

2  inconsistent with the statements in her proffer, we do intend

3  to raise the proffer during cross-examination and confront her

4  with those inconsistent statements.  We believe this is

5  appropriate.  Of course, by testifying, she's putting her

6  credibility squarely at issue.

7        THE COURT:  Mr. Lassar.

8        MR. LASSAR:  I agree, they can raise it if the

9  proffer is inconsistent with her testimony.

10        THE COURT:  Do you have to refer to it as a proffer,

11  I mean, or a statement that was given perhaps would be better.

12        MS. STREICKER:  Yes, your Honor.

13        THE COURT:  Unless Mr. Lassar would prefer "proffer."

14        MS. STREICKER:  We had intended to describe it as an

15  interview or meeting.

16        MR. LASSAR:  That's fine.

17        THE COURT:  All right.  Whatever, but you're not

18  going into the detail -- if she testifies inconsistently, then

19  you will use her statement to impeach or attempt to impeach

20  her.  All right.  Fine.  That's acceptable.

21        MS. STREICKER:  Thank you, your Honor.

22        THE COURT:  Do you want to check with the jurors,

23  make sure they're ready?

24        Get the next witness in, if you will.

25      (Proceedings heard in open court.  Jury in.)

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 9 of 106 PageID #:6592
Dominguez - direct by Lassar
4120

1           THE COURT:  Please be seated.

2           Good morning, members of the jury.  We're ready to

3    proceed.

4           Sir, would you stand and raise your right hand.

5     (Witness sworn.)

6           THE WITNESS:  I do.

7           THE COURT:  Please be seated.

8           We're ready to proceed with additional witnesses on

9    behalf of the defendant Ms. Pramaggiore.  Mr. -- counsel, you

10   may continue with -- or conduct your examination.  Excuse me.

11          MR. LASSAR:  Thank you, Judge.

12     JOSEPH DOMINGUEZ, DEFENDANT PRAMAGGIORE'S WITNESS, SWORN

13                      DIRECT EXAMINATION

14   BY MR. LASSAR:

15   Q.  Would you state your name, please, and spell your last

16   name?

17   A.  It's Joseph Dominguez, and it's spelled D-o-m-i-n-g-u-e-z.

18   Q.  Mr. Dominguez, are you appearing today pursuant to a

19   subpoena?

20   A.  Yes.

21   Q.  And are you currently employed?

22   A.  I am.

23   Q.  And what is your job?

24   A.  I'm the president and chief executive officer of

25   Constellation Energy.

1    Q.  Mr. Dominguez, I don't think the jury has heard about
2    Constellation Energy.  Would you explain to them how that came
3    into being and how it relates to Exelon and ComEd, please?
4    A.  Sure.  Constellation Energy is the largest clean energy
5    company in the country.  We own power plants, mostly nuclear
6    power plants, that produce 24/7 clean electricity, zero carbon
7    electricity.  That's what we're known for.  We also have a
8    retail business where in states like Illinois where you can
9    buy your energy from someone other than the utility.  We
10   provide that service, mostly to large commercial, industrial
11   customers.  We have about 13,000 employees.

12          The company came into being around last February.
13   And a decision was taken to split the, what we call the wires
14   business but what you would understand as ComEd and the local
15   utility business from the generation assets that actually
16   produce power and the competitive power suppliers like
17   Constellation in the market.

18          So we kind of split Exelon really almost in two
19   pieces.  Exelon had about 34,000 employees.  We ended up with
20   13 or 14,000 of them and all the power plants and all the
21   competitive businesses.

22   Q.  And what happened to the electric utilities like ComEd?
23   A.  ComEd and five other electric utilities remained with
24   Exelon.  They didn't get split off.  So they're presently
25   known as Exelon, and my company is called Constellation, a new

1    name.

2    Q.  And before you had this job, what was your job?

3    A.  I was the CEO of ComEd before this job.

4    Q.  Now, I want to go back and give some aspects of your

5    background to the jury.  Are you an attorney, sir?

6    A.  I am an undergraduate engineer and then went back and

7    became a lawyer later on.

8    Q.  And did you have occasion to serve as an Assistant United

9    States Attorney as a federal prosecutor?

10   A.  I did.  I served in the Philadelphia office of the U.S.

11   Attorneys roughly between '94 and '99, although I continued as

12   a special assistant because I had a couple cases that hadn't

13   wrapped up by the time I went back to my law firm.

14   Q.  And at some point, did you get hired by Exelon?

15   A.  I did.  About three years after I left the U.S. Attorney's

16   office, I was pitching Exelon for business and ended up with a

17   job offer.  So I decided to come in-house.

18   Q.  And what did you initially do at Exelon?

19   A.  I -- my initial job was to head litigation in the east for

20   the company.  And we had had a number of class action lawsuits

21   around Superfund sites.  We were also in the middle of

22   building some power plants in Boston that ran into destruction

23   delays, so there was big construction litigation.  And then

24   just the typical odds and ends litigation that you would have,

25   you know, as a local utility.  And for me that was PECO Energy

Dominguez - direct by Lassar

4123

1    which is the ComEd of Philadelphia.

2    Q.  So you were a lawyer, an in-house lawyer --

3    A.  I was, yes.

4    Q.  -- for Exelon.

5         And then at some point, did you get promoted to head

6    government affairs?

7    A.  I did.  Around 2006 or 2007 -- I'm not going to be perfect

8    with the dates here -- but we had gone through an attempted

9    merger with another utility, and it failed.  But the idea was

10   that had it been successful, I was going to go work at this

11   utility in New Jersey, but that never happened.

12        So after the merger failed, I became the general

13   counsel for the generation company, all the power plants, all

14   the business I presently run.  And I also for the first time

15   started to assume responsibility for the public advocacy of --

16   for that company and in particular, in connection with

17   legislation that was pending here in Springfield.

18   Q.  And so do you have -- how many people were on your staff

19   in government affairs, approximately?

20   A.  Not that many, maybe six or seven total.

21   Q.  And did you have some external lobbyists who were hired?

22   A.  I did.  I had some in Pennsylvania, very few in Illinois

23   at that point in time.

24   Q.  And did ComEd have their own government affairs unit?

25   A.  Yes.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 13 of 106 PageID #:6596
Dominguez - direct by Lassar
4124

1  Q.  And did they have a lot more external lobbyists than

2  Exelon Generation did?

3  A.  Yes, always.

4  Q.  They kept a large roster of lobbyists on hand all the

5  time?

6  A.  Correct.

7  Q.  And are those lobbyists paid a retainer each month?

8  A.  Yes.

9  Q.  And so that -- so they're available when they're needed by

10  ComEd?

11  A.  Yes.

12  Q.  And did you do the same thing at Exelon Generation with

13  your external lobbyists?  Were they also paid a retainer?

14  A.  Yes.

15  Q.  And so they would be available if you needed them?

16  A.  That's right.

17  Q.  And sometimes would you hire a lobbyist to keep them out

18  of the hands of your competitors because they might be

19  particularly effective lobbyists?

20  A.  I don't know that I have done that, but certainly others I

21  felt have done it with regard to us, but it was common

22  practice to either hire lawyers, public relations firms,

23  lobbyists, others because in the middle of the big legislative

24  campaign, one of the strategies might be to deprive your

25  opponents of, you know, lobbying or public affairs or

1    communications representation.

2    Q.  And I think, did you lobby yourself in Illinois?

3    A.  I never thought I was -- needed to be registered as a

4    lobbyist, but I was registered anyway just out of an abundance

5    of caution.  What I would provide is substantive information

6    about, at the time I was at Exelon Generation, functioning of

7    the markets, the power markets.

8    Q.  If there was legislation that was of interest to Exelon

9    Generation in Illinois, would you consult with the legislative

10   affairs people at ComEd?

11   A.  I guess it would depend on what the legislation was.  If

12   it potentially impacted both companies, I would, but if it was

13   just a Generation issue, probably not so much.

14   Q.  What kinds of people would you hire as external lobbyists

15   when you were the head of Ex Gen government affairs?

16   A.  You mean the educational background or --

17   Q.  Well, who did you look for?  Who would you look for?

18   A.  Oh, you know, well, people who had been involved in

19   politics and were familiar with the folks that we would be

20   lobbying and had relationships with them.

21   Q.  Did it happen sometimes that you terminated a lobbyist?

22   A.  Sure.  I did -- terminated many lobbyists.

23   Q.  When you do that, do you have to consider who they have

24   relationships with and who might be offended or -- by that

25   lobbyist being terminated?

1  A.  Yeah.  You know, I think it's like that old story about

2  never hire family members because when it goes sideways, it's

3  just harder to get rid of them.  It's a little bit like that

4  with lobbyists, I think.  You know, they have relationships,

5  and that has to be factored in.  On the other hand, you

6  just -- you know, you can't just keep them on just because

7  they have a relationship.  So you have to manage that

8  discussion, I guess is the best way I would say it.

9  Q.  Mr. Dominguez, I want to ask you a couple of questions

10  about your relationship with Anne Pramaggiore.  You know Anne,

11  of course?

12  A.  Yes, of course.

13  Q.  Would it be fair to say that you are rivals at Exelon

14  Corporation?

15  A.  Yeah, I think so.  I think, you know, we were both moving

16  up pretty much at the same time.  Both had a lot of success at

17  the company, probably aspired to the same sorts of positions

18  overall but, you know, I don't -- I don't want that to be read

19  as we had a bad relationship.  I liked Anne as a person.  I

20  think she respected skills I had.  I respected skills that she

21  had.  But yeah, I would say in the fabric of Exelon, there was

22  competition among top executives, and Anne and I were part of

23  that.

24  Q.  Did you respect the job that she had done at ComEd as the

25  CEO?

Dominguez - direct by Lassar

1  A.  I did.

2  Q.  Why is that?

3  A.  Well, you know, I only saw it really from an outsider's

4  perspective because I wasn't at ComEd, but I mentioned this

5  situation we had where we were trying to merge with the

6  company in New Jersey.  And one of the questions the New

7  Jersey regulators had is, you know, what would happen to

8  service.  And at that time, we were pointing to PECO Energy as

9  being really a great example of how Exelon ran utilities.  And

10  it was a reflection of the fact that ComEd was in the dumps,

11  one of the worst performing utilities in America by almost any

12  measure.

13          And Anne had come in and taken over the leadership

14  after Frank Clark and turned that around.  And the people

15  there had pride in their work again.  And I thought she had

16  done a good job making necessary investments.  And by the time

17  I inherited ComEd, it had gone from being one of the worst

18  performers in the country to arguably the very best and the

19  lowest rates.

20  Q.  Now, I want to ask you about some legislative matters in

21  Illinois but first of all, I want to ask you, before 2011,

22  2011, do you recall, is when the Smart Grid legislation

23  passed?

24  A.  Generally.  I had no involvement in that.

25  Q.  Well, let me ask it this way.  Before the Smart Grid

Dominguez - direct by Lassar

4128

1  legislation passed, how did Exelon and ComEd fare in the

2  General Assembly in Illinois?  Were you always successful,

3  never successful, somewhere in between?

4  A.  I think I -- I don't know how to -- I'd say it was a mixed

5  bag.  I came in really to deal with this issue of the rate

6  freeze that would have had pretty significant negative

7  implications, and we were able to beat back rate freeze

8  legislation.  So we had been successful there.  Other things,

9  it was just a mixed bag, you know, we weren't successful on.

10  Q.  Was there some legislation that allowed Exelon to have

11  swap agreements, s-w-a-p?

12  A.  Yes.

13  Q.  And when was that?

14  A.  That was the resolution of the rate freeze legislation.

15  Again, Mr. Lassar, I'm just bad with this stuff, but it was

16  '07, '08-ish when we got it done.

17  Q.  And is it possible to explain in simple terms so that I

18  can understand what a swap agreement is?

19  A.  Well, I hear you're a smart guy, so that should be an easy

20  bar to climb over.  Let me -- let me put it with kind of

21  another energy commodity so that -- to give you an example, a

22  real-life example.

23          Say you were wanting to lock in the price of gasoline

24  that you would use in your car for the next three years.  And

25  you'd have all sorts of forecasts around, hey, it's going to

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 18 of 106 PageID #:6601
Dominguez - direct by Lassar
4129

1    go over 4 bucks, the Ukraine war is not going to end, it's

2    going to be ugly, all the way to people saying, no, all that

3    stuff will get resolved.  We'll create more oil in the country

4    and the price of gasoline will drop.  But there is this

5    uncertainty about what the price of the commodity would be.

6          A swap is an arrangement where we pick a price and we

7    say, to give you a guaranteed price, I'll offer for the next

8    three years to sell you gasoline for $3.75.  And I wear the

9    risk that the price goes higher than 3.75 and I've got to sell

10   it to you at a discount from the market, and I also enjoy the

11   benefit of if the price drops below 3.75, I'll put that money

12   in my pocket.

13         So in the context of the rate freeze legislation, we

14   did that with electricity.  Exelon Generation offered the

15   State of Illinois a contract for 3,000 megawatts of energy.

16   One megawatt of energy is enough to power 1,000 homes, so

17   we're talking about a real lot of energy, around three nuclear

18   power plants' worth of energy.  And we sold that at a fixed

19   swap price to the State for a period of five years wearing the

20   risk that the price would go higher or enjoying the benefit if

21   the price went lower than the contracted price.

22         You tell me.  How was that?

23   Q.  That was pretty good.

24   A.  All right.

25   Q.  I think I got it.

Dominguez - direct by Lassar

4130

1    A.  Okay.

2    Q.  And did that, the opportunity to have swap agreements, did

3    that turn out to be extremely beneficial to Exelon Generation?

4    A.  It ended up being in the money for Exelon Generation.  In

5    other words, the prices weren't as high as the strike price in

6    the swap, and so we were able to sell the energy to Illinois

7    customers at a premium to what the market ultimately ended up

8    trading at.  We didn't know it at the time.  It could have

9    gone either way at the time.  It ended up being very valuable.

10   Q.  And could we say conservatively that it was worth oodles

11   and oodles of money?

12   A.  I will tell you it was probably worth over a billion

13   dollars of value.

14   Q.  Now, about the Smart Grid legislation, you don't recall

15   being involved in that?

16   A.  To my knowledge, I never was.

17   Q.  Do you know if the Smart Grid legislation having passed

18   was beneficial for the ComEd customers in Illinois?

19   A.  I always thought it was, yes.

20   Q.  Why?

21   A.  A few reasons.  I think first, it was our customers that

22   were suffering from poor reliability.  You know, we have

23   hurricanes in the southeast, and we all hear the newspaper

24   reports that they would take out a million customers, these

25   big hurricanes that plow through Florida and New Orleans.  We

Dominguez - direct by Lassar

4131

1   were having what amounted to be fairly simple summer storms in

2   the midwest -- which don't get me wrong, are intense -- but we

3   were losing upwards of a million customers to outages.

4           So going from a company that was one of the worst

5   performers to one of the best performers had a lot of value to

6   our customers.  And in our business, we economically compute

7   that value through what we call a loss of load calculation.

8   But basically, it's just some scientific analysis of, what

9   happens to economies when they lose electricity.  Stores can't

10  open.  People can't go to work, whatnot.  So that produced a

11  lot of value.

12          The other thing was a little bit like the swap.

13  There was a formula for calculating the return on equity, the

14  return that ComEd would make for investments, and that was

15  linked to Treasury rates.  And so what ended up happening is,

16  completely unanticipated, Treasury rates and inflation rates

17  remained low for an historically long period of time.  So the

18  result was that customers got the benefit of lower rates than

19  almost anywhere else in the U.S.

20          And then the third real benefit -- and this is a

21  little bit harder to understand, but I think I can make it

22  clear -- is ComEd doesn't get all of the money it uses to

23  invest in the system from customer bills at any one year.  We

24  buy things, big equipment, that we pay off over a period of

25  time.  And to match that, we borrow lots of money.  About 50

1    cents on every dollar we invest in the system, we borrow.

2           Well, before the rate freeze, ComEd's credit ratings

3    were horrible because it was losing -- it was losing the

4    ability to recover even things that it had invested in in the

5    regulatory system.  So as we got to a more predictable way of

6    making investments and getting paid for them, the credit

7    rating of the company got -- was elevated, and as a

8    consequence of that, the cost of borrowing for ComEd, which

9    customers ultimately pay for, went down.

10          So in those three ways, the return on equity ended up

11   being far more favorable than I think anybody anticipated for

12   the customer; the improved reliability which had a real-life

13   economic value plus a practical value for families and

14   businesses; and thirdly, by making ComEd more creditworthy, it

15   lowered the cost of borrowing and, therefore, lowered bills.

16   Q.  Did the -- did the formula rate result in ComEd making

17   extremely high profits compared to other utilities?

18   A.  No, no, not compared -- but what it did provide is

19   certainty so that ComEd could make large investments in the

20   system, which don't get me wrong, we wanted to make.  So there

21   was economic value to making large investments in the system

22   because that's how we made money, but in terms of the percent

23   of return you actually got, it was one of the poorest in the

24   nation.

25   Q.  You said you weren't involved in the Smart Grid campaign,

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 22 of 106 PageID #:6605
Dominguez - direct by Lassar
4133

1   but do you recall being involved in a campaign to defeat a

2   bill known as Tenaska?

3   A.  Yes.

4   Q.  And would you remind the jury what the Tenaska bill was

5   about?

6   A.  Tenaska was about building a power plant in southern

7   Illinois that would not be electrically interconnected to

8   northern Illinois but would use a new type of technology that

9   would burn a fossil fuel and sequester the emission, pull out

10  the CO2 and other air pollutants so that they could be

11  injected into the ground.  It was an experiment.

12  Q.  And was Exelon Generation opposed to that bill?

13  A.  Yes.

14  Q.  Why?

15  A.  Well, because at the time we -- you know, for a variety of

16  reasons, for our C & I customers, they weren't going to get

17  the benefit.

18  Q.  Your which customers?

19  A.  Oh, I'm sorry.  Our commercial and industrial customers in

20  northern Illinois.  Because the plant wasn't interconnected to

21  the electric system in the north, they were going to pay for

22  that and not get any benefit from the energy.  So that was

23  kind of the philosophical opposition.

24          The other thing is we had behind the scenes -- not

25  really behind the scenes.  I don't want to say it that way.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 23 of 106 PageID #:6606
Dominguez - direct by Lassar
4134

1  But we had agreed with Senator Durkin that we would provide

2  about $50 million of funding out of Exelon Generation to build

3  this experimental plant.  And they were getting donations from

4  a lot of different people, and they were going to match it up

5  with Department of Energy funding so they could build a plant.

6  And then at some point in time, the cost of the plant

7  got so outrageously expensive that they wanted to put it on

8  customer bills up north, and we were opposed to that.  And

9  also it would have affected power markets by adding

10 government-sponsored supply in what was a competitive market.

11 MR. LASSAR:  Judge, if the system is working, I'd

12 like to show the parties Defense Exhibit 1063 and the witness,

13 and I offer it into evidence.

14 THE COURT:  Any objection?

15 MR. BHACHU:  No, Judge.

16 THE COURT:  It's admitted.  You may publish it.

17 (Defense Exhibit 1063 received in evidence.)

18 BY MR. LASSAR:

19 Q.  And let me know.  Have you got it there?

20 A.  This is the message from Bill Von Hoene?

21 Q.  Right.

22 A.  Yes, I'm here.

23 Q.  And what's the date?

24 A.  May 27, 2011.

25 Q.  And you are copied on this email?

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 24 of 106 PageID #:6607
Dominguez - direct by Lassar
4135

 1  A.  I am, yes.

 2  Q.  And remind us, what was Mr. Von Hoene's position at the

 3  time?

 4  A.  Bill was kind of like the number two in the company.  He

 5  sat over legal, communications, mergers and acquisitions, and

 6  also my responsibilities for governmental affairs and for

 7  public policy.

 8  Q.  And do you see at the -- in the second paragraph, the

 9  first sentence --

10  A.  Yes.

11  Q.  -- says, "We have calculated the negative impact of the

12  Tenaska bill to Exelon as in excess of $400 million"?

13  A.  Yes.

14  Q.  And does that correspond about what your thinking was at

15  the time?

16  A.  If he got the number, he probably got it from me or my

17  team or consultants but honestly, I just don't remember.

18  Q.  At any rate, Tenaska would have been very bad for Exelon

19  Generation?

20  A.  It would have been, yes, and for customers.

21  Q.  And why for customers?

22  A.  Same point I made earlier.  The plant wasn't going to be

23  electrically interconnected, so you have people in Chicago and

24  northern Illinois paying for a power plant that's going to do

25  nothing for them.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 25 of 106 PageID #:6608
Dominguez - direct by Lassar
4136

1  Q.  If you -- in the first paragraph, the second line from the

2  end, it says, do you see, "The Speaker has not yet shown his

3  hand"?

4  A.  Yes.

5  Q.  And was it common in Illinois that you would not know

6  whether the Speaker Madigan supported a bill or didn't support

7  a bill?  It was hard to tell?

8  A.  Yes.

9  Q.  And that was the case with Tenaska?

10  A.  I don't really remember, but that was the case with almost

11  anything I worked on.  So, yeah, I'd include Tenaska.

12  Q.  And it was hard to tell what the Speaker's position was

13  despite the fact that Mike McClain was a consultant to ComEd

14  and to Exelon Generation, right?

15  A.  Yes.

16  Q.  What was the -- well, were legislative strategies with

17  Tenaska, both ComEd and Exelon Generation were opposed to the

18  bill, were the strategies -- did you talk to the ComEd

19  legislative people?

20  A.  Yes.

21  Q.  And what was the strategy to defeat the bill, if you

22  recall?

23  A.  I don't know if it was at this time, but this bill just

24  kept coming back year after year.  We eventually became part

25  of a coalition called the STOP Coalition, and it was -- it

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 26 of 106 PageID #:6609
Dominguez - direct by Lassar
4137

1    probably was an acronym for something.  I don't remember.

2    Stop Tenaska, something.  But it had a lot of parties in it --

3    environmentalists, big customer groups, Illinois Manufacturers

4    Association, Illinois Merchants Association type of groups,

5    the utilities, the generation companies, of course -- that all

6    kind of bound together to lobby against the bill.  On the

7    other side was the proponents of Tenaska and the labor unions.

8            MR. LASSAR:  Judge, I would like to show the witness

9    and the parties Defense Exhibit 1064 and offer it into

10   evidence.

11           MR. BHACHU:  No objection, Judge.

12           THE COURT:  No objection, it's admitted.  You may

13   publish it.

14      (Defense Exhibit 1064 received in evidence.)

15   BY MR. LASSAR:

16   Q.  And is this an email that you wrote?

17   A.  Yes, it is.

18   Q.  And do you say in the -- do you say in the email on the

19   top, "We have released all the Gen Co folks.  John Hooker can

20   report whether he has released his internal and external

21   folks."

22           Do you see that?

23   A.  Yes.

24   Q.  And when it says, when you say, "We have released all the

25   Gen Co folks," what does that mean?

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 27 of 106 PageID #:6610
Dominguez - direct by Lassar
4138

1  A.  Well, I'm looking at the date.  It's 2:00 a.m. in the
2  morning on May 30th.  The session would have ended the
3  following day.  And what I'm saying here to Chris -- Chris?
4  Yeah, to Chris is, we've done everything we can at this point.
5  We've had every meeting we can.  It was a full-court press.
6          And at this point, I'm sending all the -- all of our
7  lobbying team home because I don't think we can do anything
8  more, and the folks have worked pretty hard.  And I gave him a
9  sense of where we thought the roll call was, which was
10  favorable to our position.
11  Q.  At the end of that paragraph you say, "It will be very
12  close.  We need all the company lobbyists to actively engage."
13  A.  Uh-huh.
14  Q.  That didn't sound like you sent them home.
15  A.  Yeah, I don't know how to explain that.  I --
16  Q.  Well, at least --
17  A.  I think I'm sending them home for the evening maybe is
18  what this is.  It's 2:00 a.m. in the morning, I'm sending them
19  home and maybe I'm -- honestly, Mr. Lassar, I don't remember.
20  Q.  You told them they could take the rest of the day off?
21  A.  It was -- a generous boss.
22  Q.  Yeah.  Now, in your legislative discussions with the
23  people at Ex Gen and with the people from ComEd, who from
24  ComEd was involved in legislative strategy at that time, if
25  you recall?

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 28 of 106 PageID #:6611
Dominguez - direct by Lassar
4139

1   A.  Well, I mean, John was -- John had the title.

2   Q.  John Hooker?

3   A.  John Hooker, right.  Anne Pramaggiore was involved.  I

4   think Darryl Bradford was involved, our general counsel.  But

5   on something like this, it probably went all the way up to

6   Frank Clark.  And clearly, even John Rowe, the CEO of the

7   company, was paying attention.

8   Q.  And what was Frank Clark's position at the time?

9   A.  If I remember correctly, he was the CEO of ComEd at that

10   time.

11   Q.  And in the discussions on legislative strategy, did

12   anybody say, "We should ask Speaker Madigan to kill the

13   Tenaska bill"?

14   A.  Sure.  I mean, we were asking everybody to kill the bill.

15   We were asking everybody to vote against it, Madigan included,

16   and we were making our case.

17   Q.  Did anybody say, "Madigan owes us, and so he will kill

18   this bill for us"?

19   A.  No.

20   Q.  Did you recommend asking Madigan to kill this bill?

21   A.  I guess I'm a little confused because we're lobbying every

22   member of the General Assembly, literally everybody.  Okay.

23   And we were asking them -- we were telling them all the

24   reasons why this was a bad idea, all the reasons why it would

25   end up with families and businesses in northern Illinois

1    paying for something they didn't benefit from and urging them
2    to vote "no" on the bill.

3         So I don't know if I spelled out Madigan, but he
4    would have been a focus as would have been the governor's
5    office and all the legislative leaders.

6    Q.  Did anybody suggest that Madigan owed a favor to ComEd
7    and, therefore, he would kill the Tenaska bill for ComEd and
8    Exelon Generation?

9    A.  No.  We perceived it as a really hard issue for Madigan
10   because he had great affection for the labor unions, in our
11   estimation.  And so I didn't know where he was going to go on
12   this.

13   Q.  And in the case of Tenaska, the unions were on the other
14   side from ComEd and Exelon Generation?

15   A.  Yeah, because they were looking for all the jobs that
16   would be created by building a power plant.  It was a big
17   project.

18   Q.  And was the legislative strategy successful in defeating
19   this bill?

20   A.  It -- yes.  It never happened, but if I remember
21   correctly, it came back again.  It just kept coming back.  And
22   I think ultimately -- I just don't know where the -- from a
23   timing perspective when 2011 was, but we probably had to deal
24   with it for three successive sessions, maybe two successive
25   sessions.  I don't remember.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 30 of 106 PageID #:6613
Dominguez - direct by Lassar
4141

 1  Q.  For how long were you the head of the -- of government
 2  affairs at Exelon Generation?
 3  A.  From a state standpoint, from that time that I got that
 4  job in 2006 and it stayed in the portfolio of my
 5  responsibilities up until I started at ComEd, and that would
 6  have been August 1, 2018.
 7  Q.  And for most of that time, who was the head of government
 8  affairs at ComEd?
 9  A.  It was Fidel and John Hooker at different times.  I don't
10  know who --
11  Q.  You don't recall when John Hooker retired?
12  A.  I don't remember when John stepped down.
13  Q.  And that's Fidel Marquez?
14  A.  Yes.
15  Q.  From -- was -- most of the state work that you did, was
16  it -- was there more work in Illinois than other states?
17  A.  I would say Illinois, Pennsylvania, and Maryland were
18  probably the most intense during that period of time.  In any
19  given year, you know, one could be a lot hotter.
20  Q.  And in working with Fidel Marquez, did you come to have an
21  opinion about his competence?
22  A.  Yes.
23  Q.  What was that?
24  A.  I guess I thought he was strong, you know, politically and
25  strategically but I thought he had -- I guess what I -- the

1  way I would say it is this.  There was probably a detail, a

2  substantive detail about what the actual bill language does to

3  the business that I thought was lacking.  That kind of

4  describes it.

5  Q.  How about as a manager?

6  A.  I -- you know, my opinion was really formed by what people

7  were saying about him and his leadership style which wasn't

8  always flattering.

9  Q.  Now, I want to ask you about the legislation that

10  eventually was known as FEJA.  And in 2014, do you recall what

11  Exelon was looking for in terms of legislation in Illinois?

12  A.  Yes.  We were -- we were trying to create a situation

13  where -- we had always tried to pass or enact something that

14  was a carbon policy that would force power plants that pollute

15  to pay for the cost of their pollution.  And that had been

16  historically the position of the company really since I joined

17  it in 2002.  And it got close.  It got close to passing

18  nationally in 2008, but it got killed by the fossil fuel

19  industry.

20          And so there were kinds of two ways that you could

21  recognize the positive attributes of things like wind, solar,

22  hydro, nuclear to a certain extent that didn't produce air

23  pollution.  You could either force the polluters to pay which

24  would increase their price and allow these other entities to

25  make more money, or you could give a direct subsidy, a direct

1    payment, to the clean energy resources that were producing
2    carbon-free electricity.

3        The State made a determination earlier that the way
4    they were going to go was not to impose a tax on polluting
5    generators but to reward people who produce clean energy with
6    a subsidy.  So that included everything, really ended up
7    including everything but nuclear.  So hydro, geothermal, wind,
8    solar, all the obvious things were included as being eligible
9    to receive subsidy payments, but nuclear was excluded.

10       And so through a combination of factors, low natural
11   gas prices that were in existence at that time and the
12   subsidies being paid to everybody else in the market, nuclear
13   started to become uneconomic, and we were forced making an
14   existential decision.  We were either going to shut down the
15   plants or we were going to convince state legislators to give
16   us a subsidy, much smaller subsidy but a subsidy nonetheless
17   for producing clean energy the way they had provided it to
18   geothermal, wind, solar, hydro.

19   Q.  And were legislative strategies developed to try and get
20   that through the legislature?

21   A.  Yes.

22       MR. LASSAR:  Judge, I'd like to show the witness
23   Defense Exhibit 1108.

24       MR. BHACHU:  No objection, Judge.

25       THE COURT:  It's admitted.  You may publish it.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 33 of 106 PageID #:6616
Dominguez - direct by Lassar
4144

1    (Defense Exhibit 1108 received in evidence.)

2   BY MR. LASSAR:

3   Q.  And if you look at Page 2, sir.

4   A.  Yes.

5   Q.  What is this document?

6   A.  Let me just take a --

7   Q.  Sure.

8   A.  -- quick minute with it.

9   Q.  Sure.

10    (Pause.)

11  A.  I don't know how deep you want to go into it, Mr. Lassar,

12  but I recognize the document.  I just haven't read it in

13  forever.

14  Q.  And this document is from you, correct?

15  A.  Yes.

16  Q.  And would you read the second paragraph under the

17  executive summary, please?

18  A.  The one that begins "short-term" or --

19  Q.  No, "Our overall strategy."

20  A.  Oh, "Our overall strategy is to use our recent public

21  comments concerning nuclear plant economic challenges and

22  possible retirements to make progress in the following three

23  areas."

24  Q.  And that's consistent with what you recall that the

25  overall strategy was to try and get legislation to help these

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 34 of 106 PageID #:6617
Dominguez - direct by Lassar
4145

1    plants that were losing money?

2    A.  Yes.

3    Q.  And would you look at Page 18 of 57 on the bottom?

4    A.  Yes.

5    Q.  And are these talking points for meetings with the

6    governor and the Speaker and the Senate president?

7    A.  Yes, they look to be.

8    Q.  And are these efforts to persuade the governor and the

9    Speaker and the Senate president of the need for this

10   legislation to pass?

11   A.  Yeah.  We were probably at this time beginning a

12   discussion of, okay, what's going on economically, what do the

13   plants need to survive and what are they receiving in the

14   market, what are the benefits the plants provide from a clean

15   energy perspective, what would happen if they retired and you

16   lost all that supply, what would happen to energy prices,

17   those sorts of things.

18           So we were beginning that conversation with

19   policymakers.

20   Q.  Did anyone in legislative strategy sessions say, "You

21   don't have to try and persuade Speaker Madigan because he's in

22   our pocket already"?

23   A.  No.

24   Q.  Did you ever think that Speaker Madigan was in Exelon or

25   ComEd's pocket?

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 35 of 106 PageID #:6618
Dominguez - direct by Lassar
4146

1  A.  No, I didn't.

2  Q.  Did anyone say at this time, "He owes us a favor"?

3  A.  No.

4  Q.  The next year in 2015, was there further efforts to pass

5  this bill?

6  A.  Yes.

7  Q.  And what was the strategy in 2015?

8  A.  I think in '14, we were just alerting people the problem.

9  By '15 -- let me just go back to '14 for a moment.

10  One of the things that came out of the '14 session is

11  policymakers saying, "Wait a second.  We've got the company

12  coming in and telling us all this, but we need to have some

13  independent experts opine on the customer impacts of losing

14  these critical power plants."  So they directed the Illinois

15  Commerce Commission to retain experts to begin to analyze

16  these issues.

17  And so by the time we started in '15, the Illinois

18  Commerce Commission had already made recommendations that were

19  essentially saying that the plants would have a very -- had

20  they been lost, northern Illinois would have a significant

21  impact in terms of economics, clean air, and perhaps

22  reliability.  I don't remember.

23  And so we were using that as a foundation to start

24  creating legislation that would provide a subsidy payment or a

25  credit for clean energy.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 36 of 106 PageID #:6619
Dominguez - direct by Lassar
4147

1    Q.  And what was the legislative strategy in 2015?

2    A.  Well, again, to educate on what the ICC had done and to

3    see if we could pass the zero emission credit that would

4    preserve the plants from closing.  And I don't know what else

5    to say.  That was the focus.

6            MR. LASSAR:  Judge, I'd like to show the witness and

7    the parties Defense Exhibit 1047 and to offer it into

8    evidence.

9            THE COURT:  Any objection?

10           MR. BHACHU:  No objection, Judge.

11           THE COURT:  It's admitted.  You may publish it.

12      (Defense Exhibit 1047 received in evidence.)

13   BY MR. LASSAR:

14   Q.  Do you see the email from Michael McClain to you?

15   A.  Yes.

16   Q.  And the subject is "Revised PowerPoint"?

17   A.  Yes.

18           A JUROR:  We have different --

19           MR. LASSAR:  I'm sorry.

20           A JUROR:  We have 1107 up.

21           MR. LASSAR:  It's 1047.

22           A JUROR:  Thank you.

23   BY MR. LASSAR:

24   Q.  Okay.  I think we're all on the same page now.

25           And is Mr. McClain suggesting what Chris Crane should

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 37 of 106 PageID #:6620
Dominguez - direct by Lassar
4148

1  say to Speaker Madigan when they meet?

2  A.  I -- I don't know if it was just for the Speaker, but --

3  because we were using this power plant -- PowerPoint with all

4  of the legislative leaders and the governor, but I think this

5  one reflects his best guess as to what would resonate for the

6  Speaker.

7  Q.  So he's telling you how to -- what might persuade the

8  Speaker?

9  A.  Yes.

10 Q.  And do you see in the beginning of the second paragraph he

11 says, "The most important thing is for Chris Crane and

12 yourself to be fully transparent."  Do you see that?

13 A.  Yes.

14 Q.  Did you attend this meeting with the Speaker?

15 A.  I don't think so.

16 Q.  But Chris Crane did?

17 A.  Yes.

18 Q.  And did the Speaker tell Chris Crane that he was all in

19 and he would support whatever Exelon Generation needed?

20 A.  If he did, Chris never said that to me.

21 Q.  Do you also see in the third paragraph down, Mr. McClain

22 says, "Read his body language and his eyes.  If an eyebrow

23 goes up, ask him if what you just said needs further

24 explanation."

25 A.  Yes, I see that language.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 38 of 106 PageID #:6621
Dominguez - direct by Lassar
4149

1  Q.  Again, did you know at this time what the Speaker thought

2  about your bill and whether he would support it or not support

3  it?

4  A.  No.

5  Q.  And Mr. McClain couldn't tell you?

6  A.  No.

7  Q.  In the second paragraph, do you see that Mr. McClain says,

8  "Although they have met and I speak very highly of CC."  That

9  would be Chris Crane?

10  A.  Yes.

11  Q.  It says, "generating companies are suspect."  Do you see

12  that?

13  A.  Yes.

14  Q.  And is that consistent with your understanding that

15  Speaker Madigan was skeptical of generating companies?

16  A.  I would -- I guess I would say yes to that.

17        MR. LASSAR:  Judge, I'd next like to show and

18  introduce Defense Exhibit 1079.

19        MR. BHACHU:  No objection.

20        THE COURT:  It's admitted.  You may publish it.

21    (Defense Exhibit 1079 received in evidence.)

22  BY MR. LASSAR:

23  Q.  And do you see the second from the top, there's an email

24  from you to Chris Crane?

25  A.  Yes.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 39 of 106 PageID #:6622
Dominguez - direct by Lassar
4150

1  Q.  And in this email, are you suggesting talking points for,

2  it looks like, another meeting for Chris Crane and Speaker

3  Madigan?

4  A.  It looks like it, yes.  If I would go to the next page, I

5  definitely laid out the speaking points.

6  Q.  And on that second page, do you see that you have

7  underlined, "As you know, veto session legislation is

8  incredibly difficult to achieve and internally, we must be

9  focused on the reality of shutdown decisions."

10        Do you see that?

11  A.  Yes.

12  Q.  And was there ever optimism that this bill would pass?

13  Was there confidence it would pass?

14  A.  I worked on this for three years of my life, and I woke

15  every day with a different opinion as to whether it was going

16  to pass or wasn't going to pass.  At some point, some points

17  you felt like you were making progress and then at other

18  times, you felt like you were just punching water and you

19  weren't making a dent.

20        And so I guess there were some of those mornings

21  where I was confident and full of vim and vigor and then other

22  mornings where I wanted to slit my wrists.

23  Q.  During those three years, did Anne Pramaggiore ever say to

24  you, "Joe, don't worry about this.  We got the Speaker on our

25  side.  The bill will pass. "

Dominguez - direct by Lassar

4151

1    A.   No.

2    Q.   Looking at your email below the bullet points, do you see,

3    would you read the part that begins, "Mike Carrigan"?

4    A.   Could you tell me what page you're on?

5    Q.   I'm sorry.   The first page.

6    A.   "Mike Carrigan met with the Speaker recently, and the

7    Speaker sent him away with the impression that he expects to

8    deal with nuclear after the auctions, if needed, meaning if

9    units are in jeopardy of retirement.   The Speaker is of the

10   view that any announcement in September can be reversed by

11   later action."

12   Q.   Who is Mike Carrigan?

13   A.   Mike Carrigan was at this point the head of the AFL-CIO in

14   Illinois.

15   Q.   And what is that organization?

16   A.   It's an umbrella organization for a lot of the

17   construction and trade unions that we all use to build stuff

18   and keep plants running and electricity wires operating, all

19   of that.

20   Q.   Did you have an understanding of whether unions were

21   important to Speaker Madigan?

22   A.   Yes, for sure, they were.

23   Q.   Why?   Why did you have that view?

24   A.   Look, we weren't -- obviously, we weren't close, but my

25   impression of him was that he was kind of an old school

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 41 of 106 PageID #:6624
Dominguez - direct by Lassar
4152

 1  Democrat that cared about blue collar jobs more than just

 2  about anything else.

 3  Q.  And so is Mike Carrigan reporting back to you what he has

 4  found out about some of the Speaker's thinking?

 5  A.  Yes.

 6  Q.  In 2015, did Speaker Madigan do anything to help the bill

 7  get passed?

 8  A.  Not to my knowledge.

 9  Q.  Pardon me?

10  A.  Not to my knowledge.  It didn't get passed.

11  Q.  And do you recall that around August of 2015 that because

12  it didn't look like a bill was going to pass that year that

13  you came up with an idea of having the legislative leaders and

14  the governor publicly request that Exelon keep the power

15  plants open?

16  A.  Yes.

17  Q.  And do you recall that Speaker Madigan refused to do that?

18  A.  He wasn't interested.

19  Q.  Did anybody say, "He can't do that, he owes us a favor"?

20  A.  No.

21  Q.  Now, let's move to 2016.  Again, was there another effort

22  to pass the legislation in 2016?

23  A.  Yes.  This was the third year of the effort.

24  Q.  Same strategy basically?

25  A.  Same strategy in terms of how the nuclear plants would be

1    treated, but the difference between '15 and '16 is that a

2    coalition was starting to form around other interests in an

3    energy bill.  There's, the environmentalists were very hot to

4    trot on energy efficiency programs that would reduce emissions

5    by reducing the amount of energy needed.  And so ComEd was

6    working with them on that, on just different utility issues

7    that were going on at that point in time, but there were

8    discussions that had been formed there, and then we became a

9    party to those discussions.

10           So the difference between '15 and '16, in my

11   estimation, is whereas the first couple of years, this was one

12   company trying to push it, albeit with good arguments, there

13   just -- and the labor unions, there was just not going to be

14   enough support unless we addressed other interests with other

15   parties.  We tried to put together a more comprehensive

16   package.

17   Q.  So you were looking toward getting everybody on board in

18   one big bill, is that --

19   A.  You were never going to get everybody on board.  It just

20   was never going to happen but you -- what we were trying to do

21   was see if we could cobble together something that reflected a

22   broad coalition of interests.

23           MR. LASSAR:  And I'd like to show the witness Defense

24   Exhibit 1123 and offer that into evidence.

25           MR. BHACHU:  No objection.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 43 of 106 PageID #:6626
Dominguez - direct by Lassar
4154

1    THE COURT:  It's admitted.  You may publish it.

2    (Defense Exhibit 1123 received in evidence.)

3    THE WITNESS:  Okay.

4  BY MR. LASSAR:

5  Q.  What is this document?

6  A.  Looks like, I think it's from me to McClain.  Yeah, it's

7  from me to McClain.  I'd have to read it to remember it.

8  Q.  Is this a text message --

9  A.  Yeah --

10  Q.  -- that you wrote to McClain?

11  A.  -- it's a text message.

12  Q.  And just generally speaking, are you discussing

13  strategies, legislative strategies?

14  A.  Yes.

15  Q.  And in the third paragraph, the second sentence, do you

16  say, "The only way that I see this happening in the spring if

17  there is some agreement between all the leaders and the

18  governor to make it happen."

19    Do you see that?

20  A.  Yes.

21  Q.  And in the third paragraph on the bottom, do you say, "Two

22  weeks ago, the Senate president expressed his view that we,

23  all the parties, need to develop a complete package"?

24  A.  Yes, I see that.

25  Q.  So the -- and that's, by "the complete package," does that

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 44 of 106 PageID #:6627
Dominguez - direct by Lassar
4155

1   refer to all the groups coming together into one bill?

2   A.  Yes.

3   Q.  And then you say in the beginning of the second paragraph

4   from the bottom, "In a perfect world, we would get some

5   insight from the Speaker on potential paths forward."

6           Do you see that?

7   A.  Yep.

8   Q.  So at this point in time, who was being more helpful to

9   Exelon; the Senate president or Speaker Madigan?

10  A.  I don't know that -- it's hard to characterize it that

11  way.  I think in terms of talking to us, the Senate president

12  was saying, "Look, if you get everybody together on a bill and

13  satisfy a broader coalition, I think you have a shot."  And I

14  think we were just in an information vacuum with the Speaker.

15          So I was guessing here that he wanted to save the

16  plants because of his interest in preserving the jobs, but I

17  just didn't know.  And I think probably I'm trying to push

18  Mike to see if he could get the Speaker to say something, just

19  something.

20  Q.  And was that successful?

21  A.  I don't think so.

22          MR. LASSAR:  Let me next show you Defense Exhibit

23  1098.

24          THE COURT:  Any objection?

25          MR. BHACHU:  No, Judge.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 45 of 106 PageID #:6628
Dominguez - direct by Lassar
4156

1    THE COURT:  It's admitted.  You may publish it.

2    (Defense Exhibit 1098 received in evidence.)

3    THE WITNESS:  Okay.

4  BY MR. LASSAR:

5  Q.  Who is David Fein?

6  A.  David worked for me.  He was a senior vice president for

7  state governmental affairs, or he might have been vice

8  president at this point.  At some point we made him a senior

9  VP.  I just don't remember.

10  Q.  And do you see that attached to this is a package of

11  documents for Chris Crane?

12  A.  Yes.

13  Q.  And would you look at Page 31 of 47?

14  A.  Yes.

15  Q.  And what is this document?

16  A.  It purports to be the Illinois legislative plan for Exelon

17  Generation in 2016.  I think that's what it is, but I haven't

18  looked through it.

19  Q.  And were you involved in coming up with this plan?

20  A.  Oh, sure, yes.  Sure.  I was deep in the substance on all

21  this stuff.

22  Q.  And people from ComEd were also chipping in on their

23  ideas?

24  A.  That, I don't know if it's ComEd is in this or if it's

25  just from the Ex Gen side of it.

Dominguez - direct by Lassar

1  Q.  If you look at the very first page, the cover page by

2  David Fein on Page 1 --

3  A.  Are you at 31 of 47 still?

4  Q.  No.  I'm back on Page 1 on the cover email.

5  A.  Okay.

6  Q.  Do you see at the bottom, David Fein says to Chris Crane,

7  he notes, "The revised memo reflects some additional insights

8  and suggestions from Anne"?

9  A.  Okay.

10  Q.  And do you see on the second page in another email from

11  David Fein to Chris Crane, he says below the three bullet

12  points, "The memo and speaking points reflect input and

13  counsel from Tom O'Neill."

14  A.  Okay.

15  Q.  And who was Tom O'Neill?

16  A.  I think at this point Tom -- Tom was a lawyer, worked at

17  Exelon.  He was at this point serving in the role as general

18  counsel to ComEd.  He succeeded Darryl Bradford in that role.

19  Q.  And would you look at Page 42 of 47?

20  A.  Yes, I'm there.

21  Q.  And do you see the second bullet point from the bottom

22  says, "Activate organized labor with House Speaker Madigan and

23  Senate President Cullerton"?

24  A.  I'm trying to find that.  I can't find it.

25  Q.  The second bullet point --

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 47 of 106 PageID #:6630
Dominguez - direct by Lassar
4158

1   A.   Oh.

2   Q.   -- from the bottom.

3   A.   Yes.

4   Q.   What does that mean to you?

5   A.   Try to get organized labor to more aggressively engage on

6   the bill and, you know, emphasize the job impacts of losing

7   the plants and the job creation opportunities we would have in

8   building more renewable energy and -- you know, those were the

9   points we were making through organized labor.

10  Q.   And would you look at Page 27 of 47?

11  A.   Yes.

12  Q.   More talking points for Chris Crane?

13  A.   Yes.

14  Q.   Were you involved in drafting these, do you recall?

15  A.   I would have been.  I always hated the talking points that

16  my team developed, so I almost inevitably revised them, sure.

17  Q.   And again, are these talking points an effort to have

18  Chris Crane persuade the Speaker and other leaders why they

19  should support the bill?

20  A.   Yes.

21  Q.   And again, at this point in time in 2016, nobody said to

22  you, "You don't need to persuade the Speaker, he owes us a

23  favor"?

24  A.   No, but as I look at them, the other thing, Mr. Lassar,

25  that I failed to mention is in 2015, I had been successful

1   getting a package of legislation done in New York that did

2   effectively what Illinois would ultimately do but to save the

3   upstate New York power plants.  And that was approved by the

4   Cuomo administration in New York.

5           So I see here one of the things is to explain, you're

6   not the first one to deal with this.  New York has already

7   dealt with it.  Their solution will work here in Illinois.

8   And it was just trying to build some sort of consensus that we

9   needed to do something about this problem.

10  Q.  And if you look at Page 9 of 47, could you just tell us

11  just generally what this document is?

12  A.  This is a public advocacy campaign plan that would outline

13  advertisements, the media campaign, any kind of radio we were

14  doing, any kind of internet work we were doing to kind of get

15  the message out.  This might have had social media in it,

16  although it was probably pretty early for that.  I don't

17  remember.

18  Q.  You were planning, would it be fair to say, a huge

19  campaign to try and persuade legislators to vote for this

20  bill?

21  A.  We implemented a huge campaign.

22  Q.  What did that campaign consist of?

23  A.  All the things I talked about:  Radio, newspaper

24  advertisements, letters to the editor, that sort of stuff.

25  I'd have to go through it, but getting allies to engage and

Dominguez - direct by Lassar

4160

1  deliver the message about lost jobs, all that stuff, sitting

2  down with -- oh, God, I forget what they're called now --

3  editorial boards for different newspapers around the state to

4  explain the situation and what was at stake.

5          MR. LASSAR:  And I'd like to show the witness and

6  offer Defense Exhibit 1060.

7          THE COURT:  Any objection?

8          MR. BHACHU:  No, Judge.

9          THE COURT:  It's admitted.  You may publish it.

10    (Defense Exhibit 1060 received in evidence.)

11  BY MR. LASSAR:

12  Q.  And would you look at Page 2?

13  A.  Okay.

14  Q.  This is an email from you to Chris Crane, Bill Von Hoene,

15  and Anne Pramaggiore?

16  A.  Yes.

17  Q.  And you write, "Confidential"?

18  A.  Yes.

19  Q.  And at the bottom, you say, "Please do not forward" at the

20  very bottom?

21  A.  Oh, on the second page, yes.

22  Q.  And would you read your paragraph numbered -- numbered

23  No. 2?

24  A.  On what page are you on?

25  Q.  The second page.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 50 of 106 PageID #:6633
Dominguez - direct by Lassar
4161

1  A.  Okay.  "Labor is meeting with the Speaker on Tuesday to

2  press on nuclear issues.  Madigan called the meeting to

3  strategize for elections.  Carrigan is telling him workers

4  vote their paychecks."

5  Q.  So did -- Madigan was having a meeting to discuss

6  elections?

7  A.  Yes.

8  Q.  And did you send the labor leaders into that meeting and

9  ask them to try and persuade Madigan to support the bill?

10  A.  I don't think I was -- at this point, they were on their

11  own mission.  I didn't send anybody in.  But they told me that

12  that's what they were doing next.

13  Q.  And what does that mean, "Carrigan is telling him workers

14  vote their paychecks"?

15  A.  What I meant by that is that Carrigan is telling him that

16  if the Democrats want support in the ballot box, Democrats

17  need to do the things that labor needed, namely preserving

18  high-paying, family-sustaining jobs at the plants.

19  Q.  And if you look at your paragraph No. 3, do you see in the

20  third sentence, you say, "Staff promised us an update on two

21  issues:  One, the Speaker's view on next steps"?

22  A.  Yep.

23  Q.  And again, are you trying to figure out what the Speaker's

24  view is on this legislation?

25  A.  Yeah.  Yes.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 51 of 106 PageID #:6634
Dominguez - direct by Lassar
4162

1  Q.  And so you're trying to get it from Madigan's staff, not

2  from Mike McClain; is that right?

3  A.  That's right.

4  Q.  And in the spring, the coalition didn't come together; is

5  that right?

6  A.  My memory is that a couple things happened.  One, there's

7  this huge budget battle between Governor Rauner and the

8  Democrats, and that was sucking up all the oxygen in the room

9  in Springfield.  And we were still -- we had made great

10  progress, I thought, on, you know, a bigger bill with a lot of

11  different interests involved.  I thought it was really, really

12  close, if not there, by this point in time.  It was like 90

13  percent there, in my view but we hadn't -- yeah, we hadn't --

14  not everybody had signed off yet.

15  Q.  By "90 percent there," you mean having the -- all the

16  different interest groups agree on one bill?

17  A.  All the different elements that would have to be in the

18  bill.  There were some big outliers.  The energy efficiency

19  standards that were acceptable to ComEd weren't acceptable to

20  Ameren.  They thought that they were too stringent and created

21  a risk for Ameren, so we couldn't get Ameren on at this

22  particular point in time.  And it looks like all of a sudden

23  we're starting to see problems in downstate Illinois that

24  didn't have solutions for them in the bill.

25  Q.  Do you recall that Ameren was insisting on the formula

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 52 of 106 PageID #:6635
Dominguez - direct by Lassar
4163

1    rate extension being part of the bill?

2    A.  I think so.  I think so, yes.

3    Q.  ComEd was not seeking the formula rate extension at that

4    time, was it?

5    A.  I don't remember, Mr. Lassar.  It wasn't my focus.

6              MR. LASSAR:  And if I may show the witness Defense

7    Exhibit 1139 and offer that into evidence.

8              THE COURT:  Without objection, it's admitted.

9              MR. BHACHU:  No objection.

10      (Defense Exhibit 1139 received in evidence.)

11             THE WITNESS:  Yes, I see it.

12   BY MR. LASSAR:

13   Q.  And if you go to the 3rd page of 22.

14   A.  Yes.

15   Q.  And is this another Exelon legislative strategy document?

16   A.  Same year but now for the veto session.

17   Q.  And would you read the fourth bullet point, please?

18   A.  "Fourth, with the right coalition of supporters, open

19   paren, enviros, consumer groups, labor, ComEd, Ex Gen, Dynegy,

20   and Ameren, closed paren, strong sponsors, support from

21   downstate interests, and the rank and file support, leadership

22   will be inclined to advance a comprehensive energy bill."

23   Q.  And is that the strategy that you recall that Exelon and

24   ComEd pursued?

25   A.  That's the strategy we pursued.  What's laid out here is

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 53 of 106 PageID #:6636
Dominguez - direct by Lassar
4164

1   the four ways this thing could go beginning with nothing

2   happens to -- to this, yeah.

3   Q.  But the --

4   A.  That was --

5   Q.  -- fourth one --

6   A.  That was one we were aiming to land.

7   Q.  And why would all these groups support -- come together to

8   support one bill?

9   A.  Well, the enviros were hot to trot, as I said before, on

10  energy efficiency.  And the bill had significant increased

11  expenditures for energy efficiency.  The consumer groups

12  had -- you know, their interests were similar, but they also

13  wanted to keep bills down.

14          Labor, ComEd, and Ex Gen are all kind of obvious, I

15  would imagine, unless you need me to explain that.  And then

16  Dynegy and Ameren were the two companies from southern

17  Illinois that we were trying to get them to support it.  And

18  Dynegy owned most all the power plants in southern Illinois,

19  mostly all coal-fired power plants, and Ameren was a ComEd

20  counterpart in southern Illinois.  It was a wires company down

21  there.

22          But there were the beginnings of concerns that there

23  wouldn't be enough power supply for southern Illinois for a

24  bunch of reasons that aren't really all that important today,

25  but we were trying to see if we could get something that

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 54 of 106 PageID #:6637
Dominguez - direct by Lassar
4165

1    addressed southern Illinois issues.  Clinton was down there.

2    The Clinton nuclear plant was down there but other than that,

3    there wasn't much in the bill around southern Illinois issues.

4    Q.  And, Mr. Dominguez, were you hoping that the legislative

5    leaders would tell all these parties that they needed to come

6    together if there is -- the bill was going to pass?

7    A.  I think we came to the realization that that's the only

8    way it was going to happen.

9    Q.  Speaker Madigan did not call for the parties to come

10   together and form one bill, did he?

11   A.  I don't remember.  I -- we probably had some insights from

12   him at this point that -- or through McClain, I don't know,

13   that we needed all these parties to come together.  The reason

14   I say that is because I think we heard -- I think I heard from

15   Mike at this point that nothing's going to happen unless we

16   start dealing with some southern Illinois issues, and that was

17   this Dynegy/Ameren stuff.

18         And I said, "What do I have to do with that?  I --

19   you know, I'm not in southern Illinois other than Clinton now"

20   but, you know, "You're smart.  Maybe you can figure something

21   out."

22         And so I was sent on a mission to kind of try to work

23   out southern Illinois capacity issues, but I think that's --

24   that's why I'm hesitating saying Speaker Madigan didn't say

25   anything --

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 55 of 106 PageID #:6638
Dominguez - direct by Lassar
4166

1  Q.  Well, he wasn't publicly calling on the parties to come

2  together?

3  A.  No, but I think we were getting that intel from his

4  office.

5  Q.  Did you meet with legislators yourself and try and

6  persuade them?

7  A.  A little bit.  I was kind of more reserved for staff and

8  legislative leaders.  You know, not being from here, I let my

9  team that is from here kind of lead the way but, you know,

10  with the big -- like, the Senate president's office, the two

11  minority leaders, if we're going to have a meeting with the

12  Speaker's office, if it wasn't going to be Chris, it was going

13  to be me.

14       I did lead a lot of the discussions with the

15  governor's office, a lot of them, and that was its own

16  conundrum.

17  Q.  And you mentioned meeting with staff.  Did you meet with

18  staff of Speaker Madigan?

19  A.  Sure.

20  Q.  Who did you meet with?

21  A.  I think by now it's Heather Wier and Justin Cox.

22  Q.  And what was their role?

23  A.  They were staff for the House Democrats and they were, you

24  know, directed by Madigan.

25  Q.  And what were they doing?

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 56 of 106 PageID #:6639
Dominguez - direct by Lassar
4167

1  A.  Day to day, they would ask economic questions about the

2  plants.  It was constant, like, information requests, going

3  through the bill, trying to understand mechanically how all of

4  this would work, that sort of thing.  Just, like, the nuts and

5  bolts of the legislation, both the need for it as well as the

6  actual legislation.

7  Q.  And were -- Heather Wier Vaught and Justin Cox, were they

8  meeting sometimes with large groups of this coalition?

9  A.  Towards the end, I think they did but not at this time,

10  not in September, I don't think.

11  Q.  More in November?

12  A.  That's what I think, yeah.

13  Q.  And in these meetings that you had with Heather Wier

14  Vaught and Justin Cox, was it your impression that they were

15  there to make sure that Exelon and ComEd got whatever they

16  wanted in the legislation?

17  A.  No.

18  Q.  Why not?

19  A.  I had dealt with these people for ten years, and they were

20  just -- they were in it for what their own interests were,

21  what they thought was good policy for the state.

22  Q.  Were there often contentious meetings between you and

23  Heather Wier Vaught?

24  A.  No, I wouldn't say that, but in the course of three years

25  of negotiating and trying to create something this hard, it

 1   was -- there were lots of tense times, you know.  I'm sure --
 2   lookit, I felt like every day I was waking up with the women
 3   and men who were working at the plants on my shoulders, all
 4   those families.  Everything else that I cared about around
 5   climate change was at stake.  I'm sure I wasn't my best person
 6   all the time but they too had weighty issues, and we had
 7   friction for sure.
 8   Q.  Was Heather Wier Vaught very tough sometimes in how she
 9   pushed back on what was going to be in the final bill?
10   A.  I thought they were all tough, but it wasn't just that
11   office.  It was the governor's office.  It was just hard.
12   Q.  Do you remember that the -- there was a guy named Rich
13   Goldberg who was representing the governor's office?
14   A.  Yeah.  He was one of the guys, when I mentioned before I
15   was leading the stuff with the governor's office, I think
16   Goldberg was, like, his chief of staff.
17   Q.  Do you remember saying at the time that Heather Wier
18   Vaught could have two Goldbergs for breakfast and still be
19   hungry?
20   A.  I --
21   Q.  Sounds --
22   A.  I don't remember saying it but if I did, that was a good
23   line.
24   Q.  Sounds like -- yeah.
25   A.  Yeah, she was a tough cookie --

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 58 of 106 PageID #:6641
Dominguez - direct by Lassar
4169

1  Q.  And --

2  A.  -- and very good too.  I mean, just -- and it's weird for

3  a lot of people to understand this, but sometimes people you

4  run into that are on the other side of an issue from you for

5  lots of years, you gain a great deal of respect for.  And I

6  always thought -- I thought highly of Heather.

7  Q.  In fact, were you involved in hiring her?

8  A.  Very much so.

9  Q.  And she was hired to do what?

10  A.  Lobbying work.

11  Q.  For ComEd?

12  A.  Yeah, for ComEd.

13  Q.  And, of course, that's after she left Speaker Madigan's

14  staff, of course?

15  A.  Yeah.

16  Q.  You said that the main thing that Exelon Generation wanted

17  was, if we can put it in simple terms, a subsidy for the

18  nuclear plants?

19  A.  Yeah, I would put it in a different way.  I'd say, look,

20  what we wanted was equal treatment with other resources that

21  were doing the same thing that were already receiving a

22  payment for their clean energy attributes under Illinois law.

23  We wanted that law expanded to include nuclear.

24  Q.  And do you recall that you were looking for something like

25  $285 million?

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 59 of 106 PageID #:6642
Dominguez - direct by Lassar
4170

 1   A.  Yes.  Yeah.

 2   Q.  And do you remember that Heather Wier Vaught countered

 3   with something like 130 million?

 4   A.  I don't know where -- I don't remember where she started,

 5   but it was -- it had a "1" handle on it, and we went back and

 6   forth and back and forth and back and forth and eventually got

 7   to what I think is in the bill, 235.

 8   Q.  And ComEd was looking for microgrids, do you recall that?

 9   A.  Yes, they were.

10   Q.  They didn't get them in the legislation, did they?

11   A.  I'm not sure, Mr. Lassar.  I think they got something but

12   certainly not what -- they wanted to build, like, five

13   microgrids and I don't -- and I think they ended up getting a

14   grant for some nominal amount of money, but it wasn't going to

15   be enough to do that.

16   Q.  And they wanted to change the rates to demand-based rates,

17   do you recall that?

18   A.  I do.

19   Q.  And ComEd didn't get that either in the final bill?

20   A.  They had lost that way before the final bill, but they

21   couldn't convince people down there of the need for it.

22   Q.  In the legislative strategy meetings that you have, did

23   anyone suggest going to Madigan and complaining that his staff

24   was being too hard on Exelon and ComEd?

25   A.  No.  It worked the other way around.  At one point, the

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 60 of 106 PageID #:6643
Dominguez - direct by Lassar
4171

 1  staff went to Madigan and complained about me, and I got a
 2  call from the CEO but not -- you couldn't go to...
 3              THE COURT:  Mr. Lassar, it's time for the morning
 4  recess.  Is this a good point to break for you?
 5              MR. LASSAR:  Sure.
 6              THE COURT:  All right.  15 minutes.
 7    (Recess from 11:33 a.m. to 11:50 a.m.)
 8              THE COURT:  Please be seated.
 9              Mr. Lassar, you may continue with your direct
10  examination.
11              MR. LASSAR:  Thank you, Judge.
12  BY MR. LASSAR:
13  Q.  Mr. Dominguez, when we left off, I think I had asked you
14  if anyone suggested complaining to the Speaker about what the
15  staff was doing to you, and I think you said the opposite
16  happened and the staff complained about you.
17              What happened?  I mean, who complained to who?  You
18  don't -- I'm not asking about the details of the complaint.
19  A.  Heather and I got in a dust-up about, couldn't pin down
20  the Speaker's office as to where they were coming out on the
21  bill, and she kept, "Well, you've got to go do this.  You've
22  got to go do that.  You've got to" -- whatever.
23              And I had had enough of it and I said, "Lookit, I
24  know what I've got to do with the governor's office, with the
25  Senate Democrats, with the Republicans, all that stuff, but

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 61 of 106 PageID #:6644
Dominguez - direct by Lassar
4172

1   you're not doing anything.  And if you think these plants are

2   going to close and you're not going to own it, I'm going to

3   make sure everybody knows you own the job losses and the

4   Speaker own the job losses here."

5          It was a heated conversation.  It wasn't, like I said

6   earlier, my best ever thing to say.

7   Q.  And did --

8   A.  She screamed at me and then she hollered at me some stuff.

9   And then about a day later, I got a call from Crane, my CEO

10  Chris Crane, saying, you know, that Madigan had called him

11  directly and said, you know, "Do you know what that f'ing

12  Dominguez is saying around here" and on and on.

13         And Chris was pretty cool about it.  He understood,

14  you know, how this stuff happens and how passions are pretty

15  hot in the middle of this stuff.  So I didn't face any

16  consequences from it but, yeah, it wasn't a favorite time but

17  we would never -- look, you don't ever have the prerogative to

18  be critical of a politician's staff.  I don't care who you

19  are.  And I stepped over the line and probably deserved some

20  criticism.

21  Q.  Mr. Dominguez, in your -- you said that Heather Wier

22  Vaught was being very tough.  Can you quantify at all how much

23  money she cost Exelon Generation by her push-backs?

24  A.  I mean, you know, she whittled it -- it's just math,

25  right.  She whittled off $50 million a year for ten years, so

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 62 of 106 PageID #:6645
Dominguez - direct by Lassar
4173

1  $500 million.

2  Q.  And do you recall that the -- on the last day of the

3  session, there was an attempt to get the bill passed?

4  A.  What session?  Which session?  The veto session?

5  Q.  The veto session in 2016.

6  A.  We did pass the bill in the last veto session.

7  Q.  And again, was there optimism that the bill was going to

8  pass that day?

9  A.  I don't remember.  I think so.  I think I felt like it was

10  going to happen.

11  Q.  Did the Speaker Madigan speak on behalf of the bill?

12  A.  He might have --

13         MR. BHACHU:  Objection.  Foundation.

14         THE WITNESS:  -- but I don't remember that.

15         MR. BHACHU:  Objection.  Foundation.

16         THE COURT:  I didn't --

17         MR. LASSAR:  Let me ask another question, Judge.

18         THE COURT:  All right.

19  BY MR. LASSAR:

20  Q.  Did the Speaker, did he speak publicly on behalf of the

21  bill and try and persuade Democratic lawmakers to vote for it?

22  A.  Not that I recall.

23  Q.  Did he ask Democratic House members not to go home on the

24  last day of the session and to stay for the vote, that you

25  recall?

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 63 of 106 PageID #:6646
Dominguez - direct by Lassar
4174

1    A.  I don't remember one way or the other.

2           MR. LASSAR:  And would you -- could I show Defense

3    Exhibit 1067 and offer that in evidence.

4           THE COURT:  Any objection?

5           MR. BHACHU:  No.

6           THE COURT:  It's admitted.  You may publish it.

7       (Defense Exhibit 1067 received in evidence.)

8           THE WITNESS:  I've got it.

9    BY MR. LASSAR:

10   Q.  And you have an email to Mike McClain and many people

11   copied and you say, "This is awesome."

12          Can you see there what you're referring to that was

13   awesome?

14   A.  It looks like that we got the endorsement of the

15   International Brotherhood of Electrical Workers, the IBEW.

16   Most of the workers at our plants are IBEW workers in that --

17   I'm sorry.  Let me just read this.

18          Yeah, so all the -- what this refers to is we

19   couldn't end up figuring out a solution for downstate Illinois

20   coal plants.  It just became an impossible puzzle to fix.  And

21   there was some reluctance to save the nuclear plants because

22   the thought was that if the nuclear plants closed, it would be

23   good for the gas and coal plants.  They would -- they would

24   make up the electricity supply, and they'd be able to earn

25   more money.  So they were against us.  And their labor unions

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 64 of 106 PageID #:6647
Dominguez - direct by Lassar
4175

 1   were against us.

 2           And somehow or the other, they came to ground on

 3   those issues, and we didn't have a situation where some unions

 4   were telling policymakers to vote for and some against.  We

 5   finally got the consensus position in favor of the bill.

 6   Q.  And did the Speaker's staff also require a sunset on the

 7   formula rate?

 8   A.  I know there was a sunset, but I don't know how it got

 9   there.  I wasn't part of the formula rate stuff.

10   Q.  So at the end when this bill passed, it was a combination

11   of all these people, whose bill was it at the end?

12   A.  I'm sorry.  I don't know if I follow the question.

13   Q.  Was it the Sierra Club's bill, the labor's bill?  You

14   know, whose bill was this bill when it finally came together

15   and passed?

16   A.  It was a composite of all of those people who had

17   negotiated for years, and so all groups we talked about

18   before:  The enviros, the consumer groups, the utilities,

19   labor unions, everybody.

20   Q.  In the three years that you spent trying to get FEJA

21   passed, did you see anything that made you think that ComEd

22   was bribing Speaker Madigan?

23   A.  No.

24   Q.  At some point you became the CEO of ComEd; is that right?

25   A.  Yes.

Dominguez - direct by Lassar

4176

1  Q.  And that was about when?

2  A.  I think it was August 1st, 2018.

3          THE COURT REPORTER:  '18 or '19?

4          THE WITNESS:  '18.  I'm sorry, ma'am.

5  BY MR. LASSAR:

6  Q.  And in 2019 in the spring, were there energy bills

7  floating around at Springfield?

8  A.  Yes.

9  Q.  And basically, what were those bills?

10  A.  There was a bill that the Attorney General's office under

11  Lisa Madigan had tried to pass the year before that

12  resurfaced.  This had to do with consumer protections, low

13  income programs.

14          There was a bill, our bill which we called the Skinny

15  bill which was just to extend the formula rates.  There was a

16  bill that Exelon Generation had.  More power plants started to

17  go out of the money.  The first time we did FEJA, it only

18  touched two of the state's six nuclear sites.  Two or three

19  more started to go under water, and they were trying to reform

20  capacity markets in the state of Illinois.

21          And I think there was an environmental renewable

22  lobby had put together a bill that was going to increase the

23  funding for renewable energy in Illinois.  I think all of that

24  was floating around at some point in time.

25          MR. LASSAR:  And I'd like to show the witness and

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 66 of 106 PageID #:6649
Dominguez - direct by Lassar
4177

1    offer into evidence Defense Exhibit 1131.

2              THE WITNESS:  Do I have this?

3              MR. LASSAR:  Yes, I hope so.

4              MR. BHACHU:  No objection.

5              THE COURT:  It's admitted.  No objection, it's

6    admitted.  You may publish it.

7      (Defense Exhibit 1131 received in evidence.)

8    BY MR. LASSAR:

9    Q.  And look at the third page when you get there, please.

10   A.  Yeah, I'm here.

11   Q.  Is this another Exelon legislative strategy document?

12   A.  Yes.

13   Q.  And would you look at Page 10 of 19?

14   A.  Okay.  I'm here.

15   Q.  And would you read the paragraph, the first paragraph on

16   top, please?

17   A.  "As has been customary over the years on major energy

18   bills, by generating local grassroots activity in our plant

19   communities, keeping organized labor engaged and supportive of

20   our policy solutions, and continuing conversations with the

21   CJC" --

22   Q.  That's the Clean Jobs Coalition?

23   A.  Yes.  That's the group I was talking about of

24   environmentalists and the -- and CUB, the Citizens Utility

25   Board.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 67 of 106 PageID #:6650
Dominguez - direct by Lassar
4178

1          -- "we can put ourselves in a favorable position for

2   legislative leadership to convene stakeholders and begin some

3   form of a negotiating process on a final energy package prior

4   to the May 31st adjournment."

5   Q.  And is this the strategy that had been successful in the

6   past?

7   A.  Yes.

8   Q.  And it was the strategy that you were going to try and use

9   in 2019, Exelon was?

10  A.  Yeah, Exelon was.  I wasn't necessarily aligned at ComEd.

11  Q.  You're now the CEO of ComEd.  And you mentioned, you said

12  the Skinny bill was just having the formula rate be voted, the

13  extension to be voted on by itself?

14  A.  That's right.

15  Q.  And was it thought that that would improve the chances?

16  A.  Yeah.  I think what I thought, you know, on behalf of

17  ComEd is we can't live another three years with ambiguity on

18  this issue because the formula rate was going to expire.  So

19  we wanted to address the formula rate issues without having to

20  go through the gymnastics of pulling all these parties

21  together again.

22  Q.  And do you recall that Speaker Madigan refused to let the

23  formula rate bill proceed by itself?

24  A.  You know, I don't really remember that.  I remember at

25  some point we were trying -- no, I don't think so, Mr. Lassar.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 68 of 106 PageID #:6651
Dominguez - direct by Lassar
4179

 1  I think what that was was something different.  I think what
 2  the Speaker was trying to do was to pair us up with the
 3  consumer protections bills, not necessarily with all this
 4  other stuff that's being referred to here on Page 10.  But the
 5  point was, he wasn't going to let the formula rate bill go by
 6  itself.
 7  Q.  That was my question.
 8  A.  Yeah.  I'm sorry.
 9       MR. LASSAR:  And if I could show Defense Exhibit 1093
10  and offer that into evidence.
11       MR. BHACHU:  No objection.
12       THE COURT:  It's admitted.  You may publish it.
13    (Defense Exhibit 1093 received in evidence.)
14       THE WITNESS:  Okay.  I'm here.
15  BY MR. LASSAR:
16  Q.  And looking in the middle -- or the bottom email from you
17  to Dean Apple.
18  A.  Yeah.
19  Q.  And remind us who Dean Apple is.
20  A.  Dean was the local president of the IBEW that was
21  providing -- or representing workers at the nuclear plants
22  and -- in northern Illinois and the folks at ComEd who were
23  working on the wire system.
24  Q.  And what -- is what you're doing here is you are
25  suggesting talking points for Dean Apple when he meets with

Dominguez - direct by Lassar

4180

1    the Speaker?

2    A.  Yep, that's right.  That's what I was doing.

3    Q.  I think you said before you were big on drafting talking

4    points for people?

5    A.  Yes.

6    Q.  And you're -- at this point, you're the CEO of

7    Commonwealth Edison, but you're drafting talking points for

8    this labor leader to use with the Speaker?

9    A.  Yeah.  Somebody would have taken a first shot at it.  I

10   don't know how much I edited this.  I probably threw people

11   under the bus too readily before, but I would work on speaking

12   points.

13   Q.  And your first bullet point is, you suggest that he say to

14   the Speaker, "I was hoping to get a sense from you on how you

15   see the energy bills," correct?

16   A.  Yes.

17   Q.  Again, you're using labor to try and find out what the

18   Speaker thinks about these bills --

19   A.  Right.

20   Q.  -- is that correct?

21          And in the talking points, you were asking again for

22   Dean Apple to ask the Speaker to let the formula rate

23   extension be voted on by itself?

24   A.  Right.  That's exactly what I'm doing here.  Don't wait

25   for all this other stuff.  Deal with the ComEd and Ameren

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 70 of 106 PageID #:6653
Dominguez - direct by Lassar
4181

 1    formula rate first.  This rest of the stuff is too

 2    complicated.

 3    Q.  I want to move to a different topic briefly, and that is

 4    campaign contributions.  Did Exelon and ComEd make campaign

 5    contributions to public officials?

 6    A.  Yes.

 7    Q.  And that was done according to the law?

 8    A.  Yes.

 9    Q.  And why did they make campaign contributions?

10    A.  You support policymakers who align with your views on

11    policy.  You want to keep them in office, right.  And the

12    second thing is you want to be able to have access to make

13    your case on legislative issues.  Whether you're for or

14    against something, you want to develop a relationship with the

15    public official.

16    Q.  And was one of the recipients of campaign contributions

17    the Democratic Party of Illinois?

18    A.  Yes.

19    Q.  And Speaker Madigan was the head of it?

20    A.  Yes.

21    Q.  Do you think that campaign contributions were important to

22    Speaker Madigan?

23    A.  I think they're important to every politician.

24    Q.  Why?

25    A.  You know, some countries have mechanisms where, you know,

1    public taxes fund campaigns.  Here in the United States, each

2    candidate has to fund their own campaign.  It costs a lot of

3    dough to get on television or do the different things to run a

4    campaign, so if you don't have money, you're not going to be

5    able to run a campaign.

6    Q.  Did you think that campaign contributions to Speaker

7    Madigan and the Democratic Party were more important than

8    Exelon or ComEd hiring some people at Madigan's request?

9              MR. BHACHU:  Objection.  Form.  Relevance.

10             THE COURT:  Objection sustained.

11   BY MR. LASSAR:

12   Q.  Now, when you became the CEO of ComEd, Anne became the CEO

13   of Exelon Utilities, correct?

14   A.  She was my boss.

15   Q.  And you went from supervising how many people at

16   government affairs?

17   A.  I had more than government affairs but, you know, a couple

18   hundred people to 6,000.

19   Q.  Big jump?

20   A.  You could say that.

21   Q.  That keep you pretty busy?

22   A.  Day and night.

23   Q.  And did you have some discussions with Anne in the

24   transition?

25   A.  Yes.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 72 of 106 PageID #:6655
Dominguez - direct by Lassar
4183

1  Q.  And did she -- did Anne Pramaggiore say to you, "You
2  should know that Speaker Madigan is a friend and an ally of
3  ComEd"?
4  A.  No, not in those words, no.
5  Q.  Did she say that, "We've done favors for the Speaker, and
6  you can count on him helping us out in legislation in
7  Springfield"?
8  A.  No.
9  Q.  Did she say that there were Madigan associates who were
10  subcontractors to Jay Doherty?
11  A.  No.
12  Q.  Did she say that you were going to find out that Jay
13  Doherty had subcontractors who weren't fully employed?
14  A.  No.  She told me she liked Jay, that Jay was strong and
15  good and I could count on him.  That's all we talked about
16  Jay.
17  Q.  Now, speaking of Jay Doherty, do you recall that early on
18  in 2019, you approved his contract to be continued for another
19  year?
20  A.  Yes.
21  Q.  And you didn't read his contract, you just approved it
22  orally or in an email?
23  A.  There was a form, but it wasn't the contract that I
24  approved, yeah.  A sole source form, I think.
25  Q.  As the CEO of ComEd, you don't read forms and contracts

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 73 of 106 PageID #:6656
Dominguez - direct by Lassar
4184

1    normally, do you?

2           MR. BHACHU:  Objection.  Relevance.

3           THE COURT:  Overruled.  He can answer.

4    BY THE WITNESS:

5    A.  I think it depends on what it is.

6    BY MR. LASSAR:

7    Q.  You didn't read Jay Doherty's contract?

8    A.  No.

9    Q.  And despite the fact that you had approved Jay Doherty's

10   contract, Fidel Marquez kept wanting to discuss it with you.

11   Do you recall that?

12   A.  It was -- I recall discussing it with him a couple times

13   around an extended medical leave I had.

14   Q.  And were you kind of annoyed that he kept bringing it up

15   when you'd already approved it?

16   A.  I don't remember if I was or wasn't.

17   Q.  You didn't know that he was recording conversations with

18   you?

19   A.  No.

20   Q.  And do you record that -- do you remember that he recorded

21   a conversation with you in February of '19, February of 2019

22   where he told you that Doherty had people that were just

23   collecting checks?

24   A.  Yes.

25   Q.  And what else do you recall he said during that

1    conversation?

2    A.   The way I remember the conversation is I was going to -- I

3    was going out on medical leave.  I was going to have surgery

4    the following morning, and I got a call late in the day from

5    Fidel saying, you know, something about the Doherty contract.

6    And I think I was concerned I was late in approving it and

7    that somehow it was going to interfere with Jay being on for

8    ComEd.

9           He said, "Well, you know, I've got to tell you, it's

10   in your budget, and it's $400,000."

11          And I said, "That's a lot of money" and, you know,

12   "tell me about it."

13          He said that there were subcontractors on it, that

14   these people had been on it from -- for a long time and that

15   they, at least as I understood it, presently weren't doing any

16   work which was kind of consistent with all of our lobbyists at

17   this point because we were in this transition between the time

18   Rahm Emanuel and Mayor Lightfoot, and we were going to need

19   him for the agreement.

20          I said, "Well, look, I'm sure they've done some

21   work," but the way he raised it --

22              MR. BHACHU:  Objection, your Honor.  Hearsay.

23              MR. LASSAR:  I'll ask another question, Judge.

24              THE COURT:  Okay.  Go ahead.  Ask another question.

25   BY MR. LASSAR:

Dominguez - direct by Lassar

4186

1  Q.  Did he tell you that two of the people that were

2  subcontractors to Doherty were Frank Olivo and Ray Nice and

3  they were both from the 13th Ward?

4  A.  I don't remember, nor would it have meant anything to me

5  at the time.

6  Q.  The 13th Ward?

7      Did he tell you that these people were recommended by

8  Mike McClain?  Do you recall that?

9  A.  I don't remember.

10 Q.  Well, did you understand from what he told you that

11 Doherty's subcontractors were connected to Madigan?

12 A.  I think I understood that there was some connection, some

13 recommendation there.  And what I said to him is, "Look,

14 Fidel, anything we need" --

15      MR. BHACHU:  Objection.  Hearsay.

16      THE COURT:  He can testify to what he's thinking and

17 said.

18      THE WITNESS:  I said, "Look, Fidel, anything we do

19 here, anybody we hire has to be hired because they're

20 producing value for ComEd."  And I think, you know, there's a

21 recording of this, but I think what I told him was everything

22 we do in this space has to look like the right thing to do in

23 the light of day.

24      And we left the conversation.  He said, "Do you want

25 to talk about it again?"

Dominguez - direct by Lassar

4187

1    And I said, "Yeah.  You know, I want to get --
2    understand it a little bit more," but I was going out for the
3    surgery, "when I come back from medical leave."
4    He said, "Do you want just me in the meeting?"
5    And I said, "Just bring whomever is in -- whoever
6    knows about this stuff into the meeting," but we never got to
7    have that conversation.
8    BY MR. LASSAR:
9    Q.  He never said anything about Anne Pramaggiore being
10   involved in the Doherty subcontractors, did he?
11   A.  I don't remember.  It just told me these people had been
12   around and were doing -- were ComEd subcontractors for a long
13   time.
14   Q.  Did he tell you that the day before, he had had a
15   conversation with Anne in which he said the Doherty
16   subcontractors were just collecting checks?
17   A.  He didn't tell me about any conversation he had with Anne.
18   Q.  Did he tell you that Anne told him that he should bring
19   this to your attention?
20   A.  No.
21   Q.  Did he tell you that Anne said that you could do whatever
22   you wanted about the subs?
23   A.  No.
24   Q.  Did he tell you that Anne had a recommendation for you
25   which is that when the session in Springfield was over, that

1    you make changes in the subs?  Did he tell you that?

2    A.  He didn't tell me that.  The only thing I knew was the

3    conversation I had with Anne where she said, "We have good

4    people.  We should maintain continuity and don't -- you know,

5    hold your horses on making changes until you get to know these

6    folks."

7            That's the only thing I had heard from Anne, and

8    Marquez didn't tell me anything about a conversation he had --

9    Q.  He didn't tell you that she recommended you change people?

10   A.  He did not.

11   Q.  Did you think that Marquez was telling you that a crime

12   had been committed?

13   A.  No.

14   Q.  Did you see any reason that you had to report this

15   conversation to your boss, Chris Crane?

16   A.  No.

17   Q.  Why not?

18   A.  I thought at most what we were dealing with is somebody

19   who -- some folks who had been on our payroll had been

20   recommended.  They had been home run hitters for some time and

21   then they weren't -- you know, they weren't working.

22           But I was pretty focused on going forward.  I knew I

23   had this huge franchise agreement that needed to get done.

24   And I think I had moved into my house on November 1st.  I'm

25   not from here.  And Anne had kind of told me to keep

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 78 of 106 PageID #:6661
Dominguez - direct by Lassar
4189

1  continuity of the team, and that's the advice I was following.

2  I didn't see anything wrong with that.  It made sense.

3  Q.  Did you also think that part of the problem was that Fidel

4  was not competent and that may be one of the reasons that

5  people weren't being fully employed?

6  A.  This is February, right?

7  Q.  Correct.

8  A.  So at some point in time in the preceding fall,

9  Rahm Emanuel, who ComEd had a good relationship with, suddenly

10  announces he's not running for reelection, and now it's a jump

11  ball.  We don't know who the mayor is.  All of a sudden,

12  negotiations on this complicated franchise agreement that we

13  were working on come to a grinding halt because everybody is

14  waiting to see who the new mayor is and what their position is

15  going to be on the franchise agreement.

16         So I was more thinking, the confusion here was around

17  the reality of our political situation.  And by February maybe

18  we're down to, it's Lightfoot versus Toni Preckwinkle, I

19  think, at some point.  I don't remember the dates.  But at

20  some point, Lightfoot gets elected, and we start to figure out

21  who the other city council members are.

22         So I don't know.  I didn't really have much of an

23  opinion about what Fidel was saying other than everything's a

24  mess right now.

25  Q.  You mentioned that you signed a single source form.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 79 of 106 PageID #:6662
Dominguez - direct by Lassar
4190

1   A.  Yes.

2   Q.  And remind us what that is.

3   A.  For contracts of a certain financial size, Exelon required

4   a competitive process but you could, if what you were trying

5   to do is hire somebody who had a unique skill set, unique

6   relationships, this happened a lot with -- in the case of

7   lobbyists and lawyers, you could sign a justification not to

8   go through a competitive bid process.  So it was a sole source

9   form.

10   Q.  Before we look at that, I want to clarify one thing.  When

11   Anne said about keeping continuity, she wasn't talking about

12   subcontractors of Doherty?  You hadn't discussed those with

13   her, had you?

14   A.  We had had some conversation where I had indicated we --

15   that I might want to bring some lobbyists onto the team or

16   make some changes about folks.  And she was a little

17   frustrated and said, you know, "Don't go changing everything.

18   You've got a good team.  You've got big issues in front of

19   you."

20        It wasn't connected to Doherty or any one individual,

21   and it was relating to the entire external team and the entire

22   internal team.  By this point, I had already begun to move

23   Fidel out of the company, and I think part of her frustration

24   was that I was doing that.

25   Q.  You were going to fire Fidel anyway before he came to you

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 80 of 106 PageID #:6663
Dominguez - direct by Lassar
4191

1    and told you that the Doherty subs are just collecting checks;
2    is that fair?
3    A.  Six months earlier, I had already made the arrangement
4    with Fidel that he was going to retire from the company.
5              MR. LASSAR:  Can I show the witness Defense Exhibit
6    1094?
7              MR. BHACHU:  No objection.
8              THE COURT:  It's admitted.  You may publish.
9       (Defense Exhibit 1094 received in evidence.)
10   BY MR. LASSAR:
11   Q.  And looking at Page 4 of 5, is this the single source
12   justification form for Jay Doherty & Associates?
13   A.  Yes.
14   Q.  And does this form say that he's a consultant that has
15   specific knowledge and so this shouldn't be put out to bid,
16   basically?
17   A.  Correct.
18   Q.  It doesn't -- there's no -- there's nothing on this form
19   for listing subcontractors, is there?
20   A.  There's a big "Reason for Justification" thing.  You can
21   put anything you want in there.  I -- there's nothing that
22   calls out subcontractors here.
23   Q.  And the -- if Doherty had subcontractors, they may or --
24   they probably wouldn't require a single source justification
25   form because of the amounts of their contracts; is that right?

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 81 of 106 PageID #:6664
Dominguez - direct by Lassar
4192

 1   A.  I don't know.  I don't remember.

 2   Q.  Do you think you read this document before you signed it?

 3   A.  I do.

 4   Q.  And where did -- the "Reason for Justification," do you

 5   know who fills out forms like this and puts that in there?

 6   A.  It was Fidel's team.  I don't know who did it.  They

 7   misspelled my name.  It's pretty funny.

 8   Q.  Is this form false because it doesn't list subcontractors

 9   of Doherty?

10   A.  Not in my opinion.

11   Q.  Are Exelon contractors between Exelon and the contractor

12   and not with subcontractors?

13         MR. BHACHU:  Objection.  Form.  I didn't follow that

14   question.

15         THE WITNESS:  Yeah.  Could you repeat that?

16         THE COURT:  Let's see.

17         THE WITNESS:  I heard you say, "Are Exelon

18   contractors between the contractors and Exelon?"  Did you mean

19   "contracts"?

20         MR. LASSAR:  Oh, yes.  Let me ask it again.

21         THE COURT:  I didn't follow the question either.  So

22   you can start all over again.  I agree with Mr. Bhachu.

23         MR. LASSAR:  I'll try that.

24   BY MR. LASSAR:

25   Q.  At Exelon, are the Exelon contracts between Exelon and the

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 82 of 106 PageID #:6665
Dominguez - direct by Lassar
4193

1    contractor and not with subcontractors?

2    A.  I don't know if I could say categorically yes or no.  I

3    know -- it depends on the form of the contract.  Certain -- in

4    certain instances, we want to have legal rights as to the

5    subcontractor.  I just -- I can't give you a yes or no on

6    that.

7    Q.  Okay.  Now, at some point after you signed this form, you

8    found out that Doherty did have subcontractors, right?

9    A.  Right.

10   Q.  You didn't go back and tear this form up into little

11   pieces, did you?

12   A.  I did not.

13   Q.  You didn't think it was false?

14   A.  No, I didn't.

15   Q.  Now, I want to ask you some questions about Juan Ochoa.

16   You remember that Juan Ochoa got appointed to the ComEd board?

17   A.  Yeah, of course.

18   Q.  And how did you get involved in that?

19   A.  Very early on in my tenure, Anne and I had a discussion

20   around the ComEd board and the fact that folks were getting a

21   bit older on the ComEd board and the level of engagement --

22   Q.  Careful there on the age.

23   A.  I'll stay away from age if you stay away from hair.  How

24   about that?

25   Q.  Deal.

1    A.   There were questions about the kind of level of engagement

2    and also issues around the diversity of the board.  One of the

3    things that was important to me, important to Anne and others

4    was with an increasing Latino population in the city, we

5    needed more diversity for women and people of color on the

6    board.  We already had African-American representation, but we

7    didn't have Latino representation.

8            So it was kind -- we had had a Latino board member by

9    the name of Jesse Ruiz.  And Jesse had done a good job, at

10   least as I understood it, but stepped down to run for some

11   political office in Illinois, I don't know what, but that we

12   had a gap.  And what Anne told me is that she and Chris Crane

13   talked about want -- wanting Juan Ochoa, and it was an

14   agreement to bring Juan Ochoa onto the board, that he had been

15   highly recommended.

16   Q.   Did you learn that he was recommended by Mayor Rahm

17   Emanuel?

18   A.   I think it was Emanuel and Madigan.  That's the best I can

19   recall.  This is five years ago.

20   Q.   Rahm Emanuel and Madigan, did you say?  Okay.

21           Did Anne make it a secret that Juan Ochoa was

22   recommended by Speaker Madigan?

23   A.   Not to me.

24   Q.   Did you have dinner with Mr. Ochoa?

25   A.   Yeah, I did.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 84 of 106 PageID #:6667
Dominguez - direct by Lassar
4195

1    Q.  And did you support his being put on the ComEd board?
2    A.  I did.  I liked him a lot.
3    Q.  He was an important figure in the Latino community?
4    A.  You know, I'm not the right person to ask about whether he
5    was important or not.  What I had -- I had a good dinner with
6    him.  He had run McPier.  I was a little worried going into
7    the dinner that he was going to be this big, boisterous guy,
8    kind of a community guy and not really focused on the
9    business.  And I remember, I remember being impressed.  I was
10   pleasantly surprised.  He had a lot of business acumen.  He
11   certainly seemed to know a lot about the Latino community.

12          And at some point in time after the dinner, Marquez
13   had flipped me a note saying, you know, "I'm at this event for
14   Governor Rauner, and guess who is leading Governor Rauner
15   around this Latino Caucus."  And it was Ochoa.  So we thought
16   we had a really good guy there, or I should say, that was my
17   impression.  Others had different impressions.

18          MR. LASSAR:  I'd like to show Defense Exhibit 1086
19   and offer it into evidence.

20          MR. BHACHU:  No objection.

21          THE COURT:  It's admitted.  You may publish it.

22     (Defense Exhibit 1086 received in evidence.)

23   BY MR. LASSAR:

24   Q.  This is an email from you?

25   A.  Yes.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 85 of 106 PageID #:6668
Dominguez - direct by Lassar
4196

1  Q.  And do you see you say, "With Jesse Ruiz out of the

2  picture, I was going to talk to Carter re. timing of Juan

3  Ochoa's appointment" --

4  A.  Yes.

5  Q.  -- "to the ComEd board."

6        And do you recall why Jesse Ruiz was out of the

7  picture then?

8  A.  Yeah.  Like to connect the dots, what ended up happening

9  was Bill Von Hoene was opposed to the Ochoa piece because he

10 felt that Jesse should come back on the board.  There was a

11 bit of a history when board members left to do other things,

12 we weren't permitting them to come back on.

13       So even though Jesse was highly thought of, we

14 thought it would break the rule of letting people go run for

15 something and come back.  The --

16 Q.  Where was Jesse Ruiz at this point?

17 A.  He was, I think he was out in private practice as a

18 private practice lawyer.

19 Q.  Was he at this -- at the time of this letter, he was

20 deputy governor?

21 A.  So at the time, what happens is, at some point there's a

22 jump ball as to whether it's going to be Ruiz or Ochoa that

23 we're going to put on the board, and then Ruiz took himself

24 out of it effectively by taking the deputy governor

25 opportunity that Governor Pritzker offered him.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 86 of 106 PageID #:6669
Dominguez - direct by Lassar
4197

 1  Q.  And --
 2  A.  And I was saying in this note, okay, now that that's
 3  resolved, can we finally make an announcement here.
 4  Q.  And you're writing this to Bill Von Hoene and Chris Crane?
 5  A.  Yep.
 6  Q.  Anne Pramaggiore is not copied, is she?
 7  A.  No, but I think I had talked to Anne about, you know,
 8  what's the story here, what am I supposed to be doing.
 9  Q.  And it was Chris Crane's ultimate decision whether to hire
10  Juan Ochoa?
11  A.  Chris would have had the ultimate authority on this, yes.
12  Q.  And then the Board also -- the Exelon board had to also
13  vote on it; is that right?
14  A.  I wasn't part of that, but I believe so.
15  Q.  And you understood that Juan Ochoa was not a Michael
16  Madigan associate?
17  A.  He had gotten a recommendation from Madigan.  When I
18  talked to him at the dinner and I tried to understand his
19  background, it seemed like he was more adverse to Madigan in
20  different issues but somebody who was important to other
21  Illinois Latino policymakers.
22  Q.  He wasn't a Madigan guy.  He wasn't part of Madigan's
23  organization?
24  A.  Not to my knowledge, no.
25  Q.  Did you think that if ComEd hired Juan Ochoa on the board

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 87 of 106 PageID #:6670
Dominguez - cross by Cotter
4198

1  that Speaker Madigan would help ComEd get legislation passed
2  in Springfield?
3  A.  No.
4          MR. LASSAR:  That's all I have.  Thank you,
5  Mr. Dominguez.
6          THE WITNESS:  Thank you, Mr. Lassar.
7          THE COURT:  Who among the defendants would --
8  Mr. Cotter, you can next.
9          MR. COTTER:  Because it's almost lunch.
10          THE COURT:  For a few questions.
11          MR. COTTER:  Well, you know me, Judge, always just a
12  few questions.
13                      CROSS-EXAMINATION
14  BY MR. COTTER:
15  Q.  Good afternoon, Mr. Dominguez.
16  A.  Good afternoon.
17  Q.  I'm Patrick Cotter.  I'm one of the attorneys representing
18  Mike McClain.  You remember Mike, don't you?
19  A.  Yeah, of course.
20  Q.  I'm going to ask you a few questions, as you heard.  I'm
21  going to try and follow up on some points that came up during
22  your direct.  Okay?
23          Speaking about Mike, would you agree with me, sir,
24  that in your experience in working with Mr. McClain in
25  connection with your employment at Exelon and at ComEd that

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 88 of 106 PageID #:6671
Dominguez - cross by Cotter
4199

1  Mike was a very highly valued strategist and lobbyist for the

2  company?

3  A.  Yes, I would definitely.

4  Q.  Would you agree with me, sir, if I suggested that he was

5  one of the most valued political strategists during that time

6  period when you were working with him?

7  A.  Yes.

8  Q.  And is that because it was your understanding that

9  Mr. McClain had extensive contacts and knowledge of Illinois

10  government, particularly Springfield and the General Assembly?

11  A.  Yes.  He had been around for decades, and he had great

12  kind of tribal knowledge of all of that.

13  Q.  Right.  And that included Speaker Madigan.  You were aware

14  that he had a longstanding relationship and a deep knowledge

15  about Speaker Madigan?

16  A.  Aware of it and counted on it.

17  Q.  And it was -- right.  You counted on it.  It was valuable

18  to the corporation?

19  A.  Sure.

20  Q.  Would you -- and I don't want to do the deep dive into all

21  the various emails, etcetera, but would you agree with me that

22  Mr. McClain provided strategic advice to the corporation

23  regarding FEJA, Smart Grid, and SB9?

24  A.  I -- I don't know.  I assume he did on Smart Grid, but I

25  don't know.  I didn't work on that stuff.  But on FEJA, he

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 89 of 106 PageID #:6672
Dominguez - cross by Cotter
4200

1    worked right alongside us for years on that stuff.

2    Q.  Okay.  And would you also agree with me, sir, that Mike

3    advised ComEd and Exelon about more than just legislation?

4    For instance, he could sometimes provide insight into topics

5    such as labor leaders and labor issues in the state?

6    A.  Yes.

7    Q.  And would you agree with me too, sir, that Mike tried to

8    be and indeed was a communications link with the Speaker's

9    office?

10   A.  Yes, for sure.

11   Q.  And indeed, I think on the direct we were shown one email

12   where there was some discussion about Mike was trying to get

13   some information about where the Speaker might be coming out

14   on a particular piece of legislation, right?

15   A.  Yes.

16   Q.  That was his job, wasn't it?

17   A.  Yes.

18   Q.  That was part of his job, I should say.

19   A.  Yes.

20   Q.  Okay.  And so that ability to communicate with the Speaker

21   and his staff and to take information to them and to bring

22   information back, that was valuable and an important part of

23   the value he brought to the corporation?

24   A.  Sure, yes.  That was his job.

25   Q.  Were you aware, sir, that at the time you were making the

Dominguez - cross by Cotter

4201

1  transition from Exelon to ComEd that Mike played an important

2  role in trying to provide you with useful information to

3  perhaps give you a deeper understanding of some of the details

4  about the Springfield political scene?  Were you aware of

5  that, sir?

6  A.  I'm not sure I'm following you.

7  Q.  Let me ask it this way.  Do you recall that at one point

8  during that transition period, you received a document sent to

9  you by Fidel Marquez called the, colloquially known as the Go

10  Joe plan?  Do you remember that?

11  A.  Yes, I do.

12  Q.  Were you aware at the time, sir, that the Go Joe plan was

13  Mike McClain's idea and that he organized the group of people

14  that wrote it?

15  A.  I think Mike himself told me that.

16  Q.  Right.  And there's nothing wrong with taking credit where

17  credit is due, would you agree with me, sir?

18  A.  I think Mike had many gifts, and that was certainly one of

19  his.

20  Q.  Well, we've all heard that.

21        So and you remember the Go Joe plan, do you, sir?

22  A.  I do.

23  Q.  Okay.  I don't -- I think I'm not going to go through the

24  Go Joe plan with you, sir, in detail.  It's a rather long

25  plan.  But would you -- and the jury's already familiar with

1    it.  They've actually seen it.

2         But would you agree with me, sir, that it was a

3    rather extensive, detailed presentation to you trying to give

4    you some insight into some of the major players and the major

5    blocks of interest in Springfield?

6    A.  Yeah, I think that's -- well, you've seen it.  I think

7    that's fair.  To me it was also kind of a -- if I remember it,

8    kind of a long list of the different stakeholders that I

9    needed to get to know in my new role and kind of what was

10   important to them.

11   Q.  Sir, and this is for me because -- if you could move your

12   mike maybe a little closer.

13   A.  Oh, I'm sorry.

14   Q.  No, don't be sorry.  It's my ears, not your problem.

15        But also do you remember that the memo made --

16   actually included specific suggestions about people you might

17   want to meet with all around the state:  Republicans,

18   Democrats, labor leaders, maybe even community leaders, that

19   sort of thing?

20   A.  Yes.  Yeah.

21   Q.  Okay.  And again, sir, not to get lost in the weeds on it,

22   that's just an example of the kind of value that Mike and the

23   other people who worked on it brought to the corporation?

24   A.  I think that's fair, yeah.

25   Q.  And I think you also again -- and I don't know that we

1    need to go back to it.  The jury just saw it on Mr. Lassar's

2    direct.  But there was an email that Mr. Lassar showed you

3    where Mike brought word to you that the IBEW, the

4    International Brotherhood of Electrical Workers, had endorsed,

5    were going to get behind, FEJA.  Do you remember that?

6    A.  Yes.

7    Q.  And that was Mike McClain bringing that to you?

8    A.  Yeah.

9    Q.  Again, pretty valuable at the time, wasn't it?

10   A.  You know, Mr. Cotter, I'd just say this.  I worked in a

11   lot of jurisdictions.  Mike McClain was one of the best

12   lobbyists I've ever worked with.  He had a lot of baggage too

13   but he was -- you know, from a personality standpoint

14   vis-a-vis me, but he was good.  That's why we had him.

15   Q.  Right.  And when you say "baggage," "personality," Mike

16   could be pushy, couldn't he?

17   A.  Yes.

18   Q.  And pushy is not always fun if you're the one being

19   pushed?

20   A.  That's for sure.

21   Q.  But if Mike's pushing for you, that's a good thing, isn't

22   it?

23   A.  Yes.

24   Q.  And Mike was pushing for ComEd a lot of the time, wasn't

25   he, sir?

 1   A.   Yes.

 2   Q.   By the way, in the Go Joe plan, was there anything in

 3   there that seemed to indicate to you that Mike and the others

 4   were trying to indicate to you that, "Speaker Madigan's

 5   support could always be counted on, that he was on our side

 6   and that if we ever need him, he'll be there"?

 7   A.   Not that I remember, no.

 8   Q.   That would have been something to remember, wouldn't it,

 9   sir?

10   A.   Yes, yeah.

11   Q.   The relationship that you were aware of between Mike and

12   the Speaker, that extended during the whole time that you had

13   contact with Mike.  And I'm guessing that was primarily the

14   2014 to 2018 time period?

15   A.   Before then.

16   Q.   Okay.

17   A.   The first time I had contact with him was back in the rate

18   freeze stuff in 2007 and '8.

19   Q.   Oh, really?

20   A.   Yeah.

21   Q.   But during all that time period, sir, would you agree with

22   me that you were well aware of Mike's close relationship with

23   Speaker Madigan?

24   A.   Yes.

25   Q.   At any time during that time period, 2007 to 2018, did you

 1  ever say to Mike, "This is a problem.  You're too close to the
 2  Speaker.  There is -- that creates a problem for the
 3  corporation"?
 4  A.  No.
 5  Q.  Did you ever say to the corporation that, "We need to
 6  reevaluate our employment of Mr. McClain because he has too
 7  close a relationship with the Speaker"?
 8  A.  No.
 9  Q.  As a matter of fact, you saw it as an asset, not a
10  problem?
11  A.  I saw it as an asset, but I also didn't treat Mike like he
12  was a close confidant.  He was to me a bit of a double agent
13  and had the Speaker's interests in mind as much as he would
14  ever have our interests in mind.  So I took deliberate steps
15  sometimes to exclude him from internal conversations, also
16  other external lobbyists who were close to their policymakers.
17  It wasn't a problem.  It was just the reality of it.
18  Q.  And one of the reasons lobbyists get really close to their
19  sources, their -- the person they have the special
20  relationship with is because that's what makes them a good
21  lobbyist.  That's what gives them value?
22  A.  Yeah.  The strength of any lobbyist, right, is in the
23  relationship they have with the policymaker, not with the
24  company.  The policymaker has got to trust them and trust that
25  they're not going to advise them to do something, take a vote

1    or be on a position that's going to ultimately hurt the

2    politician, and they trust their judgment on policy.  That's

3    what you're buying when you buy -- when you contract with an

4    external lobbyist.  That's it.

5    Q.  So if you're Mike McClain, you've got to consider what's

6    good for Mike Madigan when you're making recommendations or

7    else you're going to lose that relationship?

8    A.  That's right.

9    Q.  And if you lose the relationship, he's no good to ComEd

10   anymore, is he?

11   A.  No.

12   Q.  So what --

13   A.  Look, I don't know.  McClain was just good.  Even if he

14   didn't have the Speaker relationship, he would have been a

15   good strategist.  He's a smart, good guy to have on the team

16   but certainly, one of the values we saw in him was we thought

17   he was a trusted guy by the Speaker and would be able to

18   present our issues in the best light in front of the Speaker.

19   Q.  And as far as you know, that's exactly what he did for all

20   those years?

21   A.  Yes.

22   Q.  You mentioned on direct with Mr. Lassar that you obviously

23   spent a lot of time and effort working on FEJA.  It was a

24   multiyear project, right?

25   A.  Yes.

1  Q.  And again, I don't want to go over things you've already

2  talked about, but there were moments where the FEJA, I think

3  you said it was almost a day-to-day issue whether you thought

4  FEJA would ever pass or not.  Some days you thought yes, some

5  days you thought no, and some days you just didn't know?

6  A.  Yes.

7  Q.  And Mike was part of strategic meetings on FEJA, not every

8  one obviously, but he was a part of lots of strategic meetings

9  on FEJA over the years, right?

10  A.  Yes.

11  Q.  And his opinion was valued, and you trusted his opinion?

12  A.  Yep.

13  Q.  At any time even when things were looking really bad,

14  really bad for FEJA, like it wasn't going to pass, did Mike

15  ever come to you and say, you know, "I think ComEd has some

16  special influence with the Speaker because we've been -- we've

17  been helping him, and I'm going to go to him and ask him to

18  please help us now in our hour of need.  I'll go to the

19  Speaker, and I'll get special help for us."

20  A.  No, he never said -- look, Mr. Cotter, what I thought was

21  that over the years, ComEd had earned a trust with the

22  Speaker's office and had a good relationship there.  I think

23  the Speaker in particular liked Anne and a lot of the things

24  that she had done.

25          So I thought, did we have an advantaged position

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 97 of 106 PageID #:6680
Dominguez - cross by Cotter
4208

1  vis-a-vis the Speaker?  I think we had credibility with the

2  Speaker.  I don't think I necessarily had it at Exelon

3  Generation, but I think ComEd probably did, but that's the

4  extent of it.

5  Q.  Let me ask you a question.  If Mike McClain could have

6  come to you on one of those dark days when you were trying to

7  get FEJA passed and he could have said to you, "Look, I have

8  the ability to go to the Speaker and have him to take steps to

9  make sure FEJA passes," would that have enhanced his value to

10 ComEd and to you?

11           MR. BHACHU:  Objection.  Speculation.

12           THE COURT:  Overruled.  He can answer.

13           THE WITNESS:  You mean if he had told us that he

14 could get this done no matter what --

15 BY MR. COTTER:

16 Q.  Yeah.

17 A.  -- would it have been of value?

18 Q.  Yeah.

19 A.  I don't know that I would have believed him but --

20 Q.  But if he had been able to do it, would it have enhanced

21 his value to you?

22 A.  I don't know.  It's just not a -- the reality was, we had

23 two problems.  One was with the legislature.  The other was

24 with the governor.  They were two very different problems.

25 The governor hated the legislative leaders, in particular

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 98 of 106 PageID #:6681
Dominguez - cross by Cotter
4209

1    Madigan, and that was well-known.

2            And there was nothing that anybody could have come to

3    me and said, "I'm going to make this happen."  It was just --

4    it's just not a realistic question.  I'm sorry.  I don't mean

5    to be fighting, but it just doesn't make sense.

6    Q.  It's all right.  I guess I should expect that

7    cross-examining an ex-prosecutor.  I get that.

8            We -- again, I'm not going to go over this because I

9    think it was brought out on direct, but I do want to confirm,

10   there was a document shown to you, it was Mike McClain

11   providing a multipage detailed memo to you with advice to you

12   and Chris Crane about how to approach Speaker Madigan in a

13   meeting you were hoping to have, correct?

14   A.  Yes.

15   Q.  And again, I just want to underline -- and I won't even

16   ask to have the document put up on the screen again because I

17   know the jury just saw it and they were paying attention.  But

18   at one point, Mike is even telling you to watch Mike Madigan's

19   body language.  And apparently, he has an eyebrow that's very

20   suggestive, that if you watch the eyebrow, that apparently

21   means something, right?

22   A.  Yes.

23   Q.  But at no point does he tell you, "I'll go talk to him.

24   I, Mike McClain, will go talk to Madigan beforehand and tell

25   him what it is we want."  He never said that in that memo, did

1   he?

2   A.  Not in that memo, no.

3   Q.  I'm going to change topics a little bit with you, sir.  I

4   think you'd agree with me that it's important for utilities to

5   have good relationships with the elected officials in the

6   states where they operate?

7   A.  Yes.  It's essential.

8   Q.  And Exelon is a major employer wherever it does business?

9   A.  It is.

10  Q.  Big corporation.  And because -- and you operate in many

11  states, correct?

12  A.  Yes.

13  Q.  Is it a fair statement, sir, that in your experience, it's

14  not unusual for elected officials in various localities and

15  states to sometimes make job recommendations to Exelon?

16  A.  It's not unusual.

17  Q.  It's not unusual.  ComEd is an employer in Illinois.  They

18  employ, I think you said yesterday, somewhere between 6,000

19  and 6,500 people, right?

20  A.  I think I said 6,000 but, yeah, a little bit over 6,000.

21  Q.  A little bit over 6,000.  And being recommended by an

22  elected official is not a negative for a job applicant, is it?

23  It's not looked upon as, oh, that's bad?

24  A.  No, it's not.

25  Q.  It's actually seen as positive, but it's not

1  determinative.  Is that fair?  In other words, if you get a

2  recommendation, that's good, but it doesn't mean you're going

3  to get the job?

4  A.  I think that's fair.

5  Q.  And so you didn't see anything wrong with getting job

6  recommendations from elected officials.  That was just par for

7  the course for ComEd, a big company like ComEd, right?

8  A.  Yeah.  I didn't see anything wrong with an elected

9  official telling you about some good candidate for a job, no.

10  Q.  Sure.  And if the candidate in your determination or the

11  determination of the people who worked for you was found to be

12  someone that could provide value and help the company with

13  their mission, then that was a good hire, and you would make

14  that hire?

15  A.  That's the key part of it from my perspective, the value

16  that they would provide to the company.

17  Q.  And there was also value to the company in being able to

18  respond promptly at least and recognize when an elected

19  official made a job recommendation?

20  A.  Whichever way you want to handle it, being responsive is

21  polite, right.  And the way you would want to treat a

22  respected policymaker is by being at least responsive.

23  Q.  So being able to respond quickly and, when possible,

24  affirmatively to job recommendations from elected officials

25  helps serve the corporate goals, the corporate interest?

1  A.  Lookit, I think you've got to take the recommendation for
2  what it is.  If it's a recommendation and the person ends up
3  being good and they're useful, then great.  And to the extent
4  that the elected official feels good about having recommended
5  somebody and then getting a job, that's fine, but the purpose
6  has to be about the business of the company --
7  Q.  Of course.
8  A.  -- and providing that value.
9  Q.  Right.  But my point, and the question I was trying to
10 ask -- and I apologize for the way I asked it -- is that it
11 was a good thing for ComEd, it was a plus for ComEd to be able
12 to hire somebody that an elected official had recommended
13 because that would help the relationship with the elected
14 official?
15 A.  I think that's fair.
16 Q.  And over the years, you're aware that Mr. McClain -- I'm
17 sorry.  For instance, in Illinois over the years, you're aware
18 that multiple politicians had recommended people to ComEd,
19 that ComEd ultimately made the decision it was a good hire,
20 right?
21 A.  I'm aware --
22          MR. BHACHU:  Objection.  Foundation.
23          MR. COTTER:  I'm going to get there.  I'm just asking
24 the broad question whether he's aware of recommendations from
25 elected officials in Illinois.

Case: 1:20-cr-00812 Document #: 305 Filed: 08/03/23 Page 102 of 106 PageID #:6685
Dominguez - cross by Cotter
4213

1        THE WITNESS:  I'm only aware of it as -- from what

2  people had told me but not from my personal experiences at

3  ComEd for a relatively short period of time before this whole

4  investigation became public and it was a very different world.

5  BY MR. COTTER:

6  Q.  Okay.  Well, were you aware that Jim Durkin, the head of

7  the General Assembly Republicans, had recommended an

8  individual by the name of Tom Walsh to be a lobbyist at ComEd?

9  A.  I think McClain told me that.

10  Q.  Yeah.  And McClain recommended him as well, but he was

11  also recommended by Mr. Durkin, the head of the Republicans?

12  A.  That's what Mr. McClain said.

13  Q.  I'm sorry?

14  A.  That's what Mr. McClain said.

15  Q.  You're aware Tom Walsh is a Republican.  He lobbies

16  Republicans?

17  A.  I am.

18  Q.  Yeah.  Were you aware that Senator Don Harmon asked you to

19  hire a lobbyist, asked ComEd to hire a lobbyist?

20  A.  Not offhand.

21        MR. BHACHU:  Excuse me.  Objection.  Do you want to

22  just give a time for your question?

23        THE COURT:  He doesn't remember.  He doesn't know.

24  He's not aware.

25        MR. COTTER:  He's not aware of it, so I won't ask him

1  what time he's not aware of.

2  BY MR. COTTER:

3  Q.  Sir, were you aware that Mr. McClain recommended that

4  ComEd consider hiring Aaron Winters and Cliff Englander from

5  Governor Rauner's office?

6  A.  Yes.

7  Q.  And those are Republicans?

8  A.  Yes.

9  Q.  And he was recommending them so that ComEd might have a

10  better line of communication and have a better opportunity to

11  lobby in Governor Rauner's office?

12  A.  Yeah.  In my experience, Mr. McClain recommended

13  Republicans and Democrats, just in terms of my own personal

14  experience with him.

15  Q.  Right.  Okay.  And I'm just -- I'm just -- oh, sorry.  I

16  turned it off, my mike.  Wouldn't that be a tragedy if

17  everybody couldn't hear me.

18         You were shown a document on direct.  I think it was

19  document 1108, and I'm not asking to bring it back up, but it

20  was the talking points.  It was the talking points to

21  Mr. Quinn, if you want to look at Page 18 of that document,

22  Page 18 of 57 of Defense Exhibit 1108.

23         And I guess maybe we should bring it up since the

24  only one who is looking at it right now is the witness.  And I

25  believe this is already in evidence.

1          So the only reason I bring it up, sir, is that, is

2    there a reference there, I think it's in paragraph 3 down,

3    there's a reference to a Jack Lavin.  "Over the past two

4    months."

5    A.  Yep, I see that.

6    Q.  And Jack Lavin is another person that I believe

7    Mr. McClain recommended, do you remember that?

8    A.  I'm trying to remember.  I think so.  I forget.

9    Q.  Just --

10   A.  Yeah, I think so.  I don't --

11   Q.  It's okay if you're not positive.  But do you remember

12   that Jack Lavin had worked in Governor Quinn's office?

13   A.  Yeah.  It was in a high position, maybe even chief of

14   staff.

15   Q.  He was indeed.  Good memory.

16          And indeed, that hire was not made solely on the

17   basis of the fact that he worked in Governor Quinn's office,

18   but that was an important factor, right?  It enhanced his

19   value as a potential lobbyist, correct, that he had worked for

20   Governor Quinn?

21   A.  Oh, for sure.

22   Q.  Yeah.  And by the way, the people that we've been talking

23   about, these lobbyists that Mike recommended to you, you never

24   got any complaint that any of these people that we've been

25   talking about weren't doing work, that Aaron Winters wasn't

Dominguez - cross by Cotter

4216

1    doing work or Cliff Englander or Mr. Lavin or Tom Walsh?  You
2    never received any reports that they weren't working?
3    A.  No.
4    Q.  And you certainly never communicated any time to
5    Mr. McClain that there was anything wrong in him bringing
6    these recommendations to the company?
7    A.  No.
8    Q.  Okay.  Would you agree with me, sir, on this general
9    proposition that if a potential lobbyist has a long-term
10   relationship with an elected official, that's -- that's a good
11   thing?
12   A.  I thought so.
13   Q.  And it's better than somebody who has only a slight or
14   short-term relationship with an elected official?
15   A.  Yeah, for sure, yes.
16   Q.  And the theory there is that the longer and deeper the
17   relationship, the more valuable or at least potentially
18   valuable the lobbyist is because their relationship is deeper
19   with the elected official?
20   A.  Yes.
21            MR. COTTER:  Your Honor, I probably have ten minutes,
22   maybe less.  I mean, I --
23            THE COURT:  Well, he's got to come back this
24   afternoon anyway.
25            MR. COTTER:  All right.  I'm sorry, your Honor.

4217

1          THE COURT:  It's all right.

2          MR. COTTER:  Okay.  Thank you.

3          THE COURT:  2:00 o'clock.

4          MR. COTTER:  All right.  Thank you, sir.

5      (Recess from 1:00 p.m. to 2:00 p.m.)

6                      *  *  *  *  *  *  *

7                    C E R T I F I C A T E

8          I, Judith A. Walsh, do hereby certify that the

9    foregoing is a complete, true, and accurate transcript of the

10   proceedings had in the above-entitled case before the

11   Honorable HARRY D. LEINENWEBER, one of the judges of said

12   court, at Chicago, Illinois, on April 13, 2023.

13

14   */s/ Judith A. Walsh, CSR, RDR, F/CRR*_____        April 14, 2023

15   Official Court Reporter

16   United States District Court

17   Northern District of Illinois

18   Eastern Division

19

20

21

22

23

24

25