**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 20 CR 812 |
| | ) | |
| MICHAEL McCLAIN, et al. | ) | Honorable Manish S. Shah |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**JOINT MOTION FOR RECONSIDERATION OF POST-TRIAL**
**MOTIONS AND MOTION TO DISMISS THE INDICTMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD............................................................................................. 2

BACKGROUND .................................................................................................... 3

ARGUMENT ......................................................................................................... 6

    I.    The Court Should Enter a Judgment of Acquittal on All Counts. ............................... 6

        A.    Acquittal Should Be Granted on the Bribery Counts.......................................... 6

        B.    Acquittal Should Be Granted on the FCPA Counts.......................................... 11

        C.    Acquittal Should Be Granted on the Conspiracy Count. .................................. 12

    II.    The Court Should Dismiss the Indictment.................................................................. 12

        A.    The Indictment Should Be Dismissed as Facially Insufficient......................... 12

        B.    The Indictment Should Also Be Dismissed Because the Government Misstated the Law to the Grand Jury. ............................................................... 15

    III.    The Court Should Order a New Trial for Any Remaining Counts Because of Instructional Error, an Invalid Conspiracy Conviction, and Spillover Prejudice. ...... 16

        A.    The Bribery Convictions Should Be Vacated.................................................... 16

        B.    The Conspiracy Conviction Should Be Vacated. .............................................. 18

        C.    The FCPA Convictions Should Be Vacated. ..................................................... 20

CONCLUSION...................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                          **Page(s)**

*Arthur Andersen LLP v. United States*,
    544 U.S. 696 (2005) .........................................................................................17

*Avitia v. Metro. Club of Chi., Inc.*,
    49 F.3d 1219 (7th Cir. 1995) ...........................................................................2

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988) .........................................................................................16

*Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*,
    203 F.3d 477 (7th Cir. 2000) ...........................................................................23

*Eberhart v. United States*,
    546 U.S. 12 (2005) (per curiam) .....................................................................16

*Galvan v. Norberg*,
    678 F.3d 581 (7th Cir. 2012) .............................................................................2

*Hamling v. United States*,
    418 U.S. 87 (1974) ...........................................................................................13

*Jensen v. Clements*,
    800 F.3d 892 (7th Cir. 2015) ...........................................................................18

*McDonnell v. United States*,
    579 U.S. 550 (2016) ...........................................................................................1

*Ruiz v. United States*,
    990 F.3d 1025 (7th Cir. 2021) .........................................................................18

*Skilling v. United States*,
    561 U.S. 358 (2010) .........................................................................................19

*Snyder v. United States*,
    144 S. Ct. 1947 (2024) ..............................................................................*passim*

*United Sates v. Aldrich*,
    169 F.3d 526 (8th Cir. 1999) ...........................................................................23

*United States v. Abdelaziz*,
    68 F.4th 1 (1st Cir. 2023) .................................................................................23

*United States v. Anderson*,
    61 F.3d 1290 (7th Cir. 1995) ....................................................................15, 16

*United States v. Barrios-Ramos*,
    732 F. App'x 457 (7th Cir. 2018) .......................................................12

*United States v. Bibbs*,
    2016 WL 4701441 (N.D. Ill. Sept. 8, 2016) ........................................15

*United States v. Bruno*,
    383 F.3d 65 (2d Cir. 2004)..................................................................23

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005)....................................................................6

*United States v. Correia*,
    55 F.4th 12 (1st Cir. 2022)..................................................................25

*United States v. Davis*,
    724 F.3d 949 (7th Cir. 2013) .............................................................25

*United States v. Delay*,
    440 F.2d 566 (7th Cir. 1971) ...............................................................6

*United States v. Edwards*,
    869 F.3d 490 (7th Cir. 2017) ........................................................17, 18

*United States v. Harris*,
    531 F.3d 507 (7th Cir. 2008) ...............................................................2

*United States v. Hernandez*,
    731 F.2d 1147 (5th Cir. 1984) .............................................................8

*United States v. Jimenez Recio*,
    537 U.S. 270 (2003).............................................................................12

*United States v. Johnson*,
    592 F.3d 749 (7th Cir. 2010) .........................................................7, 12

*United States v. Jones*,
    713 F.3d 336 (7th Cir. 2013) ...............................................................6

*United States v. Macrina*,
    109 F.4th 1341 (11th Cir. 2024) ..........................................................8

*United States v. McClellan*,
    794 F.3d 743 (7th Cir. 2015) .............................................................16

*United States v. Morris*,
    2000 WL 246240 (N.D. Ill. Feb. 24, 2000) ......................................13

*United States v. Murphy,*
    406 F.3d 857 (7th Cir. 2005) ................................................................6

*United States v. Resendiz-Ponce,*
    549 U.S. 102 (2007) ..............................................................................13

*United States v. Rodvelt,*
    2023 WL 6620196 (D. Or. Oct. 11, 2023) ............................................23

*United States v. Silver,*
    864 F.3d 102 (2d Cir. 2017) ............................................................16, 18

*United States v. Solomon,*
    892 F.3d 273 (7th Cir. 2018) ................................................................10

*United States v. Stillo,*
    57 F.3d 553 (7th Cir. 1995) ..................................................................25

*United States v. Stott,*
    245 F.3d 890 (7th Cir.), *amended on reh'g in part,* 15 F. App'x 355 (7th Cir. 2001) ............20

*United States v. Sun-Diamond Growers of California,*
    526 U.S. 398 (1999) ..............................................................4, 5, 8, 17

*United States v. Swan,*
    250 F.3d 495 (7th Cir. 2001) ................................................................18

*United States v. Synowiec,*
    333 F.3d 786 (7th Cir. 2003) ..................................................................8

*United States v. Thompson,*
    484 F.3d 877 (7th Cir. 2007) ................................................................13

*United States v. Thyfault,*
    579 F.3d 748 (7th Cir. 2009) ................................................................14

*United States v. Townsend,*
    924 F.2d 1385 (7th Cir. 1991) ..............................................................19

*United States v. Van Eyl,*
    468 F.3d 428 (7th Cir. 2006) ................................................................16

*United States v. Wabaunsee,*
    528 F.2d 1 (7th Cir. 1975) ....................................................................13

*United States v. Yates,*
    16 F.4th 256 (9th Cir. 2021) ................................................................20

*Yates v. United States*,
    354 U.S. 298 (1957) ........................................................................................................19

*Zant v. Stephens*,
    462 U.S. 862 (1983) ........................................................................................................18

**Statutes**

18 U.S.C. § 371 .........................................................................................................................14

18 U.S.C. § 666 ................................................................................................................ *passim*

**Other Authorities**

Fed. R. Crim. P. 29(c)(2) ............................................................................................................6

Fed. R. Crim. P. 33(a) ..............................................................................................................16

## INTRODUCTION

From the outset of this case, the Government maintained that giving things of value to a powerful politician as a reward for past acts or to curry favor without a *quid pro quo* is criminal. On that foundation, the Government built an edifice of overlapping charges. But as with all structures, if the foundation is rotten, the structure will fall. And in *Snyder v. United States*, the Supreme Court confirmed that the Government's theory has been rotten from the start.

The Supreme Court held that the federal programs bribery statute, 18 U.S.C. § 666, criminalizes only *quid pro quo* bribery—that is, offering, soliciting, or agreeing to exchange a thing of value for an official act. The Court held that this statute does not criminalize gratuities (gifts given to reward an official for past acts) and does not forbid gifts given to public officials without an expectation that the official will perform an official act in exchange. *Snyder v. United States*, 144 S. Ct. 1947, 1954–59 (2024); *see also McDonnell v. United States*, 579 U.S. 550, 563, 572–73 (2016). The Government built its case on its invalid theories at every stage—from incorrectly telling the Grand Jury that rewarding an official's past actions is illegal, all the way through to its closing argument, when it told the jury that it should convict Defendants if it believed they gave things to Speaker Madigan simply to "make him happy." It accused Defendants of conspiring to commit acts that *are not illegal*. And it argued that Defendants falsified books and records and circumvented controls to conceal *legal* conduct.

Acquittal is the appropriate remedy for the Government's strategic decision to rest its case on a rotten foundation. Defendants recognize that it is unusual to request a judgment of acquittal following a jury verdict based on a change in the law. But this is no ordinary case. Defendants in this case have been protesting their innocence from the start *precisely because* there was no *quid pro quo* that could form the basis of criminal liability. At every turn, the Government has resisted. Indeed, the Government had years to investigate Defendants' actions

and every incentive to bring forth evidence of an illegal bargain that was actually offered, solicited, or struck in this case. The Government could not come up with anything more than that Speaker Madigan had power, everyone knew it, and regulated entities like ComEd responded to that power. The Court should not allow the Government to abandon its prior theories and attempt to recast the evidence to subject these Defendants to another trial.

In the alternative, Defendants seek dismissal of the Indictment if the Court does not grant their request for acquittal because the Indictment omits the essential element of a *quid pro quo* and because the Grand Jury was improperly instructed.

At a minimum, Defendants are entitled to a new trial. The Government's incorrect theory of the law infected every aspect of the trial, and there can be no doubt that the jury was instructed that it could convict Defendants based on conduct that was not a crime. These errors were not limited to the counts based on § 666. The FCPA and Conspiracy Counts were built on the same rotten foundation, permitting the jury to conclude that Defendants conspired to engage in lawful conduct and to assign liability to Defendants under the *Pinkerton* theory of co-conspirator liability where no valid conspiracy existed. The convictions cannot stand.

## LEGAL STANDARD

A judge has the discretion to reconsider a prior ruling "if there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008); *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). While "litigants have a right to expect consistency even if judges change," a subsequent judge should not "abide by the rulings of the first judge [if] some new development, such as a new appellate decision, convinces him that his predecessor's ruling was incorrect." *Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012).

## BACKGROUND

The Government charged Defendants with federal programs bribery (18 U.S.C. § 666), falsification of documents in violation of the Foreign Corrupt Practices Act ("FCPA"), and conspiracy to commit such violations. The Indictment is based on events spanning from 2011 to 2019, years in which Defendants, each of whom was an employee or consultant of Commonwealth Edison Company ("ComEd"), hired certain individuals recommended by Michael Madigan, who was then Speaker of the Illinois House of Representatives, and during which years ComEd supported and opposed certain legislation in that legislature. Critically, the Indictment never alleges any offer or agreement (express or tacit) that Mr. Madigan would take or refrain from any official act in exchange for such hires. (*See* Dkt. 46 at 15–19.)

Throughout the life of this case, Defendants argued, as the Supreme Court has now held, that § 666 criminalizes only *quid pro quo* bribery, not gratuities, and gave the Government many opportunities to protect its case, including:

- Defendants moved to dismiss the Bribery Counts and Conspiracy Count for failure to allege a *quid pro quo* and for charging gratuities. (*See* Dkt. 46 at 6–19, 20–24.) The Government opposed Defendants' motion, arguing that "no *quid pro quo* agreement or understanding is required to establish a § 666(a) offense." (Dkt. 54 at 20.) The Court denied the motion. (Dkt. 83.)

- In 2022, nearly a year before trial, Defendants proposed instructions requiring the jury to find that Defendants must have intended to engage in a *quid pro quo* to convict for either the Bribery Counts or the § 666-related objects of Count One. (Dkt. 94.) In opposition, the Government argued that "[a] *quid pro quo* is not an element of § 666," and that the statute "does not require that the defendants contemplate an exchange for a discrete official act." (Dkt. 98 at 4–5.) The Court again sided with the Government. (Dkt. 101, June 21, 2022 Hr'g Tr. at 4:1-3.)

- Defendant Doherty sought a bill of particulars, requesting that the Government identify the alleged offers and solicitations that violated § 666, when such offers or solicitations were made and to whom they were communicated. (Dkt. 107.) The Government opposed the motion, arguing again that it was "not required to prove a *quid pro quo* or an official act." (Dkt. 111 at 2.) The Court denied the motion. (Dkt. 155, Feb. 28, 2023 Hr'g Tr. at 7:24-8:3.)

- Defendants proposed a jury instruction stating that it is legal to give a thing of value to a public official to build a reservoir of goodwill that will ultimately affect one or more of a multitude of unspecified acts now and in the future, using language taken directly from the Supreme Court's unanimous decision in *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 405 (1999). The Government objected on the ground that the proposed instruction was an attempt to incorporate a *quid pro quo* requirement. The Court agreed with the Government and did not give the instruction. (Trial Tr. 5106:3-5107:10.)

- Defendants proposed a special verdict form requiring the jury to identify the object or objects of any conspiracy for which they reached a guilty verdict. The Government objected, and the Court sided with the Government. (*Id.* at 5067:13-5073:21.) Defendants' form would have allowed this Court to determine whether the convictions on the Conspiracy Count were based on a jury finding that the object of the conspiracy was violating § 666 by paying a bribe, paying a gratuity, or for some other object.

During closing argument, the Government repeatedly asked the jury to convict Defendants without any proof of an offer, solicitation, or agreement to exchange a thing of value for an official act by Mr. Madigan. For instance, it told the jury that it should convict Defendants because they hired certain people to "please Madigan" or to "keep Madigan happy." (*Id.* at 5158:4-6 (payments to the subcontractors were made "to please Madigan, to keep him happy"); *id.* at 5158:8-9 (Mike Zalewski "was put on the Doherty contract to keep Madigan happy"); *id.* at 5213:24-5214:1 ("They were done because Madigan asked, and they were given or done to make him happy.").) The Government went so far as to say that it did not need to prove that Mr. Madigan did anything to help ComEd or that ComEd asked Mr. Madigan to do anything in order to obtain a conviction. Instead, it asked the jury to convict if it found that ComEd was "trying to keep Madigan happy so that it could receive the benefits of keeping him happy in the form of his support of legislation or at least making sure that he did not oppose that legislation" and telling the jury "that's what happened." (*Id.* at 5437:4-11.)

Defendants were convicted on all charges by general verdict. (*See* Dkts. 250–53; Dkt. 249 at PageID.2375–82 (Verdict Forms).) Defendants moved for acquittal or a new trial on

numerous grounds, including the Government's failure to prove a *quid pro quo* and the failure to instruct the jury that a *quid pro quo* was necessary for a bribery conviction. (*See* Dkts. 262–67, 270–71.) The Government again objected, characterizing Defendants' argument that *bribery* cases under § 666 require a *quid pro quo* as "frivolous." (Dkt. 325 at 85–86.) The Court denied Defendants' post-trial motions. (Dkt. 357.)

At the same time, however, the *Snyder* case was working its way through the appellate process. In response to Mr. Snyder's petition for *certiorari*, the Solicitor General of the United States took a position directly contrary to the prosecution in this case, contending that § 666 "prohibits . . . *quid pro quo* bribery" as well as gratuities. Br. for the United States in Opp'n to Cert. at 9, *Snyder v. United States*, No. 23-108 (U.S. Nov. 16, 2023). In its merits brief, the United States reinforced this position, arguing that "[i]llegal gratuity differs from bribery in that 'for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value in exchange for an official act." Br. for the United States at 3, *Snyder v. United States*, No. 23-108 (U.S. Mar. 11, 2024). And the Solicitor General recognized that bribery requires that an intent to engage in a *quid pro quo* must be conveyed to the other party, when it argued that bribery is "limited to bargains (explicit or implicit) that are offered, solicited, or struck before the official act." *Id.* at 21.

In its decision, the Supreme Court held that only *quid pro quo* bribes—not gratuities or payments made without a *quid pro quo* exchange—are prohibited by 18 U.S.C. § 666. *Snyder*, 144 S. Ct. at 1959. The Court confirmed that § 666 is a "bribery statute." *Id.* at 1954. The Court previously held that "[b]ribe[s] require[]: 'a *quid pro quo*,'" meaning "a specific intent to give or receive something of value *in exchange* for an official act." *Sun-Diamond Growers*, 526 U.S. at 404–05; *see also Snyder*, 144 S. Ct. at 1962 (Jackson, J., dissenting) (same). The *Snyder* Court

noted that § 666's prohibition of "rewards" could be interpreted to reference either "(i) a reward given after the act with no agreement beforehand (gratuity) or (ii) a reward given after the act *pursuant to an agreement beforehand* (bribe)." *Snyder*, 144 S. Ct. at 1959 (emphasis added). The Court chose the latter interpretation, making clear that the statute only prohibits giving things of value in exchange for official acts. *Id.*; *see also id.* at 1962 (Jackson, J., dissenting) ("[F]or a payment to constitute a bribe, there must be an upfront agreement to exchange the payment for taking an official action.").

## ARGUMENT

## I.  The Court Should Enter a Judgment of Acquittal on All Counts.[1]

Federal Rule of Criminal Procedure 29 provides that, upon a defendant's motion and after a guilty verdict, "the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). Judgment of acquittal should be granted where "viewing the evidence in the light most favorable to the prosecution, the record contains no evidence on which a rational jury could have returned a guilty verdict." *United States v. Murphy*, 406 F.3d 857, 861–62 (7th Cir. 2005). "A Rule 29 motion calls on the court to distinguish between reasonable inferences and speculation." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013).

### A.  Acquittal Should Be Granted on the Bribery Counts.

A court must grant acquittal if the Government's evidence gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," because in that situation, "a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Cassese*, 428 F.3d 92, 98–99 (2d Cir. 2005); *see also United States v. Delay*, 440 F.2d 566, 568 (7th Cir. 1971) ("Where the evidence as to an element of a crime is equally consistent with a theory of

---

[1] Defendants renew and incorporate their prior motions for judgment of acquittal. (*See* Dkts. 214–15, 218, 220, 262–67, 270–71.)

innocence as with a theory of guilt, that evidence *necessarily fails* to establish guilt beyond a reasonable doubt.") (emphasis added); *United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010) ("In this situation, the evidence is essentially in equipoise; the plausibility of each inference is about the same, so the jury necessarily would have to entertain a reasonable doubt.").

In denying Defendants' post-trial motions, Judge Leinenweber found that "the jury may have reasonably found that . . . the 2011 passage of EIMA, was the act for which Defendants were granting a gratuity," and that "the Government case was consistent with gratuities." (Dkt. 357 at 13–14.) In other words, Judge Leinenweber found, based on the evidence that he heard, that it would have been reasonable for the jury to find that *all* of the jobs at issue in the case were *gratuities* paid to reward Mr. Madigan for the EIMA legislation that passed in 2011. This determination was fully supported and invited by the Government. Indeed, the Government characterized a number of ComEd's employment decisions as gratuities, including the hiring of Mr. Moody, Mr. Acevedo, Mr. Ochoa, and Mr. Zalewski, and the renewal of the Reyes Kurson law firm contract. (*See* Dkt. 325 at 86; Trial Tr. 5147:15-25.) Of course, we now know that payment of a "gratuity . . . does not violate § 666." *Snyder*, 144 S. Ct. at 1959. Because Judge Leinenweber found that the jury could have concluded that *all* of the payments were gratuities, the evidence cannot support convictions on an inconsistent theory—*quid pro quo* bribery— beyond a reasonable doubt. Accordingly, acquittal is the appropriate remedy for these counts.

Acquittal on the Bribery Counts is likewise appropriate because the evidence required the Government to rely on the theory that Defendants violated the law by giving jobs to some people recommended by Mr. Madigan in the hopes of earning his goodwill or to avoid angering him, rather than in  exchange for official acts.[2] As the Supreme Court has confirmed and the Solicitor

---

[2] The Supreme Court's ruling in *Snyder* casts substantial doubt on whether there can be a violation of § 666 without an upfront agreement between the payor and the public official. *See Snyder*, 144 S. Ct. at

General has acknowledged, § 666 does not criminalize giving things of value to public officials *without* a *quid pro quo*. There was no crime unless the Government proved that Defendants had "a specific intent to give or receive something of value *in exchange* for an official act." *Sun-Diamond Growers*, 526 U.S. at 404–05; *see also Snyder*, 144 S. Ct. at 1962 (Jackson, J., dissenting) (same). And this intent to engage in a *quid pro quo* must have been conveyed to the other party. *See United States v. Synowiec*, 333 F.3d 786, 789 (7th Cir. 2003) (to commit bribery, a defendant must "express[] an ability and desire to pay a bribe"); *see also United States v. Hernandez*, 731 F.2d 1147, 1150 (5th Cir. 1984) (acquitting of bribery because "[e]ven construing the statute broadly, there must be an offer").

The Government's inability to prove a *quid pro quo* is best exemplified by the testimony of Fidel Marquez, the Government's star witness and undercover cooperator, who was personally involved in hiring people recommended by Mr. Madigan. Critically, Mr. Marquez *could not testify* that he ever believed ComEd was accepting job recommendations from Mr. Madigan in exchange for any official acts by him. Instead, Mr. Marquez described his actions accepting Mr. Madigan's job recommendations as motivated by his own personal fear of retaliation by Mr. Madigan.[3] For example, on direct examination by the Government, who met with

---

1959 ("[A] state or local official does not violate § 666 if the official has taken the official act before any reward is agreed to, much less given."); *id.* at 1962 (Jackson, J., dissenting) ("So, for a payment to constitute a bribe, there must be an *upfront agreement* to exchange the payment for taking an official action.") (emphasis added); *United States v. Macrina*, 109 F.4th 1341, 1351 (11th Cir. 2024) ("[T]he Court [in *Snyder*] made clear that the key difference between a gratuity and a bribe is whether the official and the payer *agreed* to a payment for the official act.") (emphasis added). The Court need not resolve that question to grant Defendants' motion, however, as the Government did not allege, argue, or prove that Defendants ever offered a *quid pro quo* exchange to Mr. Madigan or that Mr. Madigan solicited a *quid pro quo* exchange from Defendants.

[3] At trial, Mr. Marquez testified that he never even discussed, much less had an "agreement," with Mr. McClain that there might be "negative" consequences if ComEd did not hire enough of Mr. Madigan's recommendations. (Trial Tr. 2600:13-2601:10.) Nor did Mr. Marquez testify at trial to having any agreement with any Defendant that they were worried about or were motivated by "fear of negative consequences" if persons recommended by Mr. Madigan were not hired.

Mr. Marquez over fifty times, including no fewer than fourteen times in 2023 in preparation for trial, Mr. Marquez testified as follows:

```
 7              As a general matter, how did you react to any
 8    requests Mr. McClain made on behalf of Mr. Madigan that were
 9    sent to you?
10    A.  My reaction was to certainly put them with a high priority
11    and act on them with a sense of urgency.
12    Q.  Okay.  Did you try to fulfill them when you could?
13    A.  Yes.
14    Q.  Why?
15    A.  Because I knew, one, they were coming from Michael
16    Madigan; and, two, if they weren't fulfilled, I was concerned
17    about the reaction not fulfilling them would cause.
18    Q.  And what type of reaction were you most concerned about?
19    A.  I was most concerned about Michael Madigan being
20    negatively disposed towards ComEd.
21    Q.  And ComEd's legislative agenda?
22    A.  Yes.
```

(Trial Tr. 1874:7-22.) Later, still on direct examination, Mr. Marquez testified that certain subcontractors were "brought on as a favor to Michael Madigan" so as "[t]o gain his favor . . . for Michael Madigan to see ComEd positively" and that ComEd was seeking his favor "so that he could *perhaps* be helpful in our legislative agenda in Springfield." (*Id.* at 1904:2-13) (emphasis added). Mr. Marquez's well-prepared testimony leaves no doubt that there was no offer or agreement that Mr. Madigan would take any official acts in exchange for ComEd's acceptance of his recommendations.

Similarly, on cross-examination, Mr. Marquez testified that after seven years of being the head of legislative affairs at ComEd, he did not believe that ComEd had bribed Mr. Madigan and

that "nobody even suggested asking Speaker Madigan to help out ComEd" *(id.* at 2344:23-2346:1); that he believed that not hiring people requested by Mr. Madigan "would cause [ComEd] to be negatively looked upon by Michael Madigan," a belief that he thought was "shared within the company" (*id.* at 2346:5-13); and that he did not think that hiring such people would guarantee that Mr. Madigan would "do something to help ComEd get bills passed," (*id.* at 2346:14-22). Indeed, Mr. Marquez testified he was not aware of any action that Mr. Madigan had taken to defeat a bill that ComEd opposed or to advance a bill that ComEd supported. (*Id.* at 2344:10-22.) In its redirect examination, the Government did not ask whether Mr. Marquez believed (or heard) there was any agreement with, or *quid pro quo* offer made to, Mr. Madigan.

As exemplified by this testimony, the Government's theory at trial was that Defendants acted on Mr. Madigan's requests to keep him happy or out of apprehension of a negative reaction from him.[4] But that is not a crime. *Snyder* requires more—proof of an offer or agreement to exchange things of value for official acts. Despite ten years of investigation, two wiretapped phones, a cooperating witness, and a seven-week trial, the Government offered no evidence that anyone ever understood or had an expectation that ComEd accepted job recommendations in exchange for any official acts. Defendants should be acquitted.

The Government has at times argued that it need not demonstrate a *quid pro quo* because it is alleging a "stream of benefits." (*See, e.g.*, Dkt. 54 at 31; Dkt. 325 at 32.) Even if that theory survives *Snyder*, a "stream of benefits" does not excuse the need to prove a *quid pro quo*. To the contrary, under such a theory, the Government must prove not only the *existence* of such an agreement, but that it remained in effect at the time the things of value were given. *United States v. Solomon*, 892 F.3d 273, 277 (7th Cir. 2018). The stream of benefits theory, therefore, *raises*

---

[4] Similarly, in Mr. Marquez's surreptitiously recorded conversation with Mr. Doherty, Mr. Doherty expresses his belief that ComEd accepted job recommendations to "keep Madigan happy," not as part of a *quid pro quo* exchange for official acts. (*See* Dkt. 271 at 7–11.)

the burden of proof on the Government rather than lowering it. In this case, the Government failed to offer any evidence of such an agreement or that it remained in effect at any time.

**B.    Acquittal Should Be Granted on the FCPA Counts.**

The Court should enter a judgment of acquittal on the FCPA Counts because they are premised entirely on the Government's incorrect interpretation of § 666. The Government claims that the allegedly falsified documents are false not because they contain affirmative misrepresentations, but because they failed to disclose that a crime was being committed. (*See* Dkt. 325 at 71–73 (arguing documents were false for failing to disclose that payments "were intended to *influence and reward* Speaker Madigan") (emphasis added).) The Government repeatedly told the jury that Defendants falsified ComEd documents to conceal the "bribery" scheme. (Trial Tr. 273:17-:19 ("And the defendants further concealed that these payments were bribes by falsifying ComEd's records."); *id.* at 274:16-19 ("As part of this conspiracy, the defendants are charged with concealing the fact that these payments were bribes by falsifying ComEd records."); *id.* at 314:11-13 ("[The internal ComEd form] was intended to cover up the bribery scheme by not mentioning the payments to the subcontracts."); *id*. at 5184:21-5185:5 ("[T]he subs were kept a secret . . . [because] [t]hey were part of the bribe that was being paid to Madigan."); *see also* Dkt. 357 at 37 (holding that the jury could reasonably have concluded that what rendered the documents false was that they omitted to state that "ComEd's motivation for paying these individuals was . . .  to corruptly influence Madigan").)

*Snyder* confirms that no reasonable jury could have convicted Defendants of "bribery," because the evidence was at least equally consistent with legal gratuities or with giving a thing of value without a *quid pro quo*. *See supra* at 6–7. Because the underlying conduct is not criminal, no reasonable jury could have convicted Defendants on the basis that the documents failed to

11

disclose criminal conduct. There was no crime for the documents to conceal. The evidence at trial was insufficient to support a conviction on the FCPA Counts.

### C.     Acquittal Should Be Granted on the Conspiracy Count.

Without an agreement to commit a crime, there cannot be a conspiracy. *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) ("[T]he essence of a conspiracy is an agreement to commit an unlawful act.") (citations omitted). The Government alleges that Defendants agreed to violate § 666 and to falsify documents and circumvent internal controls in violation of the FCPA in order to conceal these violations. (Indictment ¶ 2.) But, as discussed above, the evidence is at least equally consistent with an agreement to engage in lawful conduct—gratuities and giving things of value without a *quid pro quo*. A rational jury must therefore have entertained reasonable doubt that Defendants agreed to commit a crime. *See Johnson*, 592 F.3d at 755. The Court should therefore acquit Defendants of the Conspiracy Count.

## II.     The Court Should Dismiss the Indictment.

The Court should dismiss the Indictment to the extent it does not enter a judgment of acquittal. The Indictment is fatally flawed because it does not allege a *quid pro quo*, an essential element of bribery, and because the Government incorrectly instructed the Grand Jury that it could indict Defendants for conspiracy based on the *legal* conduct of paying a gratuity. Defendants previously sought this relief (Dkt. 45), but the Court denied their request (Dkt. 83). In the wake of *Snyder*, and the production of a partial transcript of the Grand Jury proceedings confirming that erroneous instructions were given, this denial should be reconsidered.

### A.     The Indictment Should Be Dismissed as Facially Insufficient.

An indictment "must set out each of the elements of the crime to be charged" to comply with minimal constitutional standards. *United States v. Barrios-Ramos*, 732 F. App'x 457, 459 (7th Cir. 2018). Although it is "generally sufficient that an indictment set forth the offense in the

words of the statute itself," *Hamling v. United States*, 418 U.S. 87, 117 (1974), where the statutory language fails to include essential elements, the indictment must charge crimes with "greater specificity." *United States v. Resendiz-Ponce*, 549 U.S. 102, 109–10 (2007); *United States v. Wabaunsee*, 528 F.2d 1, 4 (7th Cir. 1975). Failure to state an "essential element" of the crime is not a "minor or technical deficienc[y]." *United States v. Morris*, 2000 WL 246240, at *2 (N.D. Ill. Feb. 24, 2000). Rather, such a "complete failure" is a "matter of substance," *id*., which renders the indictment "fatally defective." *Wabaunsee*, 528 F.2d at 4–5. A defect of this magnitude "requires dismissal of the indictment." *Morris,* 2000 WL 246240, at *2 (citing *United States v. Du Bo*, 186 F.3d 1177, 1180–81 (9th Cir. 1999)).

A *quid pro quo* is an essential element of § 666. *Snyder*, 144 S. Ct. at 1954; *supra* at 5–6. There are no allegations of an offer, solicitation, or agreement to exchange things of value for official acts in the Indictment, and based on this deficiency alone, the Court need go no further to grant dismissal. Instead of alleging that any exchange was offered, solicited, or agreed to, the Indictment loosely strings together an assortment of events over an eight-year period—largely hiring decisions and compensation-related payments made by ComEd and the passage of legislation favorable to ComEd—and alleges that, *ipso facto* a crime must have been committed. But "*[p]ost hoc ergo propter hoc* is the name of a logical error, not a reason to infer causation." *United States v. Thompson*, 484 F.3d 877, 879, 884 (7th Cir. 2007) (reversing and ordering judgment of acquittal on § 666 conviction).

The Indictment fails to allege a connection between these hiring decisions and any official acts by Mr. Madigan. There are no allegations that any Defendant expected that ComEd would receive any official act from Mr. Madigan in exchange. Nor are there allegations that any Defendant understood that they were obtaining anything *at all* from Mr. Madigan in exchange

13

for hiring anyone. There are no allegations that Mr. Madigan took, agreed to take, or even that Defendants believed he would take official action in exchange for the hires described in the Indictment. Indeed, the Indictment says very little about any actions by or communications with Mr. Madigan, and those that it does describe do not identify any understanding that any official act by Mr. Madigan would be made in exchange for or conditioned upon ComEd's hiring decisions. (*See, e.g.*, Indictment ¶ 28(y)–(z).) Instead, the Government alleges only Mr. Madigan's general capability to withhold or take certain action that could have impacted pending legislation, a capability available to any legislative leader—Senate, House, local, state, or federal—in the United States. (*Id.* ¶ 1(u).) There is no *quid pro quo* alleged. The failure to allege an essential element requires dismissal of the Bribery Counts if the Court does not acquit Defendants.

The same failure likewise requires dismissal of the Conspiracy Count. A conspiracy under 18 U.S.C. § 371 "requires an agreement to commit an *illegal* act." *United States v. Thyfault*, 579 F.3d 748, 752 (7th Cir. 2009) (emphasis added). But the first two conspiracy objects alleged in Count One, which largely track the statutory language of § 666, fail to allege the essential element of a *quid pro quo*. First, Defendants were accused of conspiring to aid Mr. Madigan in corruptly soliciting "things of value for [his] benefit . . . intending that [he] be influenced and rewarded." (Indictment ¶ 2(a).) Second, Defendants were accused of conspiring to corruptly give things of value to Mr. Madigan "for [his] benefit . . . with intent to influence and reward [him]." (*Id.* ¶ 2(b).) This bare recitation of the statutory language fails to distinguish between a criminal conspiracy to bribe Mr. Madigan on the one hand and a non-criminal agreement to give him things of value without any offer, solicitation, or agreement to exchange them for official acts. And the Government's theory supporting the third object—that the

14

documents were false-by-omission because they did not disclose that a crime was being committed and internal controls were circumvented to conceal a crime—falls apart because the Indictment fails to allege that any crime *was* being committed. Count One of the Indictment should be dismissed.

### B. The Indictment Should Also Be Dismissed Because the Government Misstated the Law to the Grand Jury.

Where an error in a grand jury proceeding "prejudiced the defendants," courts may dismiss the indictment. *United States v. Anderson*, 61 F.3d 1290, 1296 (7th Cir. 1995) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988)). "Prejudice occurs if a 'violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence' of the violation." *Id.* (quoting *Bank of Nova Scotia*, 487 U.S. at 256). The Government's "choice of words" before the grand jury cannot "meaningfully obscure the nature of the charges . . . or render an element missing." *United States v. Bibbs*, 2016 WL 4701441, at *2 (N.D. Ill. Sept. 8, 2016).

Here, the Grand Jury transcript reveals that the Government erroneously instructed the Grand Jury multiple times that it could indict Defendants for violations of § 666 and conspiracy to violate § 666 based on a gratuity theory. This conduct does *not* violate the statute:





Post-*Snyder*, there is no doubt that the Government's instructions misstated the law, and the Government's error "prejudiced the defendants." *Anderson*, 61 F.3d at 1296. This was not an instance of the Government merely omitting a single fact or even an element; instead, the Government's error invited the Grand Jury to indict Defendants for conduct that did not actually violate the statute. Under these circumstances, there is necessarily "grave doubt that the decision to indict" Defendants "was free from the substantial influence" of the Government's erroneous instructions. *Bank of Nova Scotia*, 487 U.S. at 263.

### III. The Court Should Order a New Trial for Any Remaining Counts Because of Instructional Error, an Invalid Conspiracy Conviction, and Spillover Prejudice.

The Court should order a new trial on any counts not subject to acquittal or dismissal pursuant to the above motions. Federal Rule of Criminal Procedure 33(a) authorizes District Courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a); *Eberhart v. United States*, 546 U.S. 12, 13 (2005) (per curiam). This remedy is especially apt "if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436, 438 (7th Cir. 2006).

#### A. The Bribery Convictions Should Be Vacated.

A jury instruction is erroneous "if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017); *United States v. McClellan*¸ 794 F.3d 743, 753 (7th Cir. 2015) ("[W]e shall reverse

---

[5] *See also id.* at 27:15-28:8; 25:17-26:6; 50:18-51:1 (describing specific evidence as showing gratuity payments, not bribes).

when the instructions misstate the law or fail to convey the relevant legal principles in full and when those shortcomings confuse or mislead the jury and prejudice the objecting litigant."). Instructional errors are especially glaring when the trial judge refuses a "request to instruct the jury on one essential element of the charges," such that the instructions "could have allowed the jury to convict [Defendants] of engaging in [lawful] conduct." *United States v. Edwards*, 869 F.3d 490, 492–93 (7th Cir. 2017) (vacating convictions for witness tampering charge for "fail[ure] to include the corruption element" in instructions); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707–08 (2005) (holding instructions "flawed in important respects" for leading "jury to believe that it did not have to find" a required element).

That is precisely what happened here. The instructions authorized the jury to convict Defendants of bribery on the basis of two forms of conduct *Snyder* confirmed do not violate § 666: gratuities and giving things of value to a public official without a *quid pro quo*. *See supra* at 5–6. In an attempt to prevent such wrongful convictions, Defendants proposed an instruction that bribery requires "the specific intent to give something of value in exchange for an exercise of an official duty." (Dkt. 140 at 58.) Defendants also proposed an instruction that clearly demarcated the outer bounds of § 666: it "is legal to give a thing of value to a public official to build a reservoir of goodwill that will ultimately affect one or more of a multitude of unspecified acts now and in the future." (Trial Tr. 5106:3-8; *see also Sun-Diamond*, 526 U.S. at 405.) The Government objected to both proposals, and the Court denied Defendants' requests. (Trial Tr. 5014:11–20, 5106:5–5107:10.) *Snyder* confirms that these rulings were in error. These defects mean the jury could have convicted Defendants based on entirely *lawful* conduct.

Convictions entered after such instructional errors must be vacated "unless the instruction error was 'harmless beyond a reasonable doubt.'" *Edwards*, 869 F.3d at 500. The "harmless-

error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict." *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015). Accordingly, even if the Court finds the "evidence was legally sufficient to support guilty verdicts" (and therefore denies Defendants' motion for acquittal), an instructional error is not harmless if the jury "*could still have* convicted [Defendants] on the basis of" conduct that is "non-criminal." *Edwards*, 869 F.3d at 500 (emphasis added). Stated differently, the burden is on the Government to *completely rule out the possibility* that the jury convicted Defendants based on conduct *Snyder* held is not criminalized by § 666. *See Ruiz v. United States*, 990 F.3d 1025, 1030–31 (7th Cir. 2021) (the "burden [is] on the government to show that the error 'was harmless beyond a reasonable doubt'"). A court can only hold such errors harmless when it is "clear beyond a reasonable doubt that a rational jury would have convicted" Defendants of bribery "if given proper instructions." *Silver*, 864 F.3d at 124; *United States v. Swan*, 250 F.3d 495, 499 (7th Cir. 2001) (reversing conviction where "the record does not contain overwhelming evidence" and "the jury was not fully informed as to the elements of a RICO violation"). But the Government cannot meet this heavy burden. *See supra* at 6–11. At a minimum, the convictions for Counts Two, Five, Six, and Eight thus must be vacated and retried.

**B.    The Conspiracy Conviction Should Be Vacated.**

The defects in the bribery instructions also render the conspiracy conviction invalid, and a new trial is required for Count One. As detailed above, the first two objects of the Conspiracy Count failed to distinguish between illegal conduct and conduct that does not violate § 666, and thus, alleged in part that Defendants conspired to engage in *lawful* conduct. *See supra* at 12.

"[A] general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant v. Stephens*, 462 U.S. 862,

881 (1983). Similarly, in *Skilling v. United States*, the Supreme Court held that constitutional error occurs, and a conviction is flawed, when a jury returns a general verdict on a conspiracy where some objects alleged are *legal* conduct. 561 U.S. 358, 414 (2010); *see also Yates v. United States*, 354 U.S. 298, 311–12 (1957) (acquitting some conspiracy defendants, and ordering a new trial for all others, where conspiracy verdict "is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"). The Seventh Circuit has deemed it impossible "to discern whether [a] verdict was based on an invalid ground" if the jury was "instructed that its verdict may rest on any single ground alleged in a charge" and one or more are later invalidated. *United States v. Townsend*, 924 F.2d 1385, 1412–13 (7th Cir. 1991).

Here, the Court cannot determine whether the jury found that there was a conspiracy to commit illegal conduct (*quid pro quo* bribery) or a legal agreement to hire people identified by Mr. Madigan as a gratuity or without a *quid pro quo*. As noted above, the Government objected to Defendants' request for a special verdict form requiring the jury to identify the objects of the conspiracy it found, and the Court sided with the Government, so it is impossible to know the objects of the conspiracy for which it convicted on a general verdict.

Any suggestion that the instructional error was harmless because the jury *may* have rested its conviction on the remaining alleged objects of the conspiracy—to falsify books and records and to circumvent a system of internal controls—is speculative and implausible. Nearly all of the forty-two page Conspiracy Count focused on giving things of value to Mr. Madigan. And at trial, the Government focused the overwhelming bulk of its presentation—and all of its most colorful evidence—on the things of value given to Mr. Madigan, Mr. Madigan's ability to take actions that could affect pending legislation, and the fates of various pieces of ComEd-related legislation that occurred during the same approximately eight-year period, rather than on ComEd documents

19

and internal controls. And, as described above, *see supra* at 14–15, the Government's erroneous theory of § 666 infected the remaining objects of the conspiracy. The Government argues that Defendants conspired to falsify documents and circumvent internal controls in order to conceal a violation of § 666—but Defendants' conduct does not violate § 666. Defendants' conspiracy convictions should be vacated.

### C.     The FCPA Convictions Should Be Vacated.

The Government's errors were not confined to the counts explicitly tied to § 666. The invalid theories of gratuity and non-*quid pro quo* "bribery" infected the remaining substantive counts premised on falsifying ComEd's internal documents and circumventing its controls. Not only were the § 666 Counts and the FCPA Counts substantively intertwined, but the jury almost certainly convicted Defendants of the FCPA Counts on the basis of a "conspiracy" to commit legal conduct. And the overwhelming bulk of the Government's most prejudicial evidence concerned matters unrelated to the dry subjects of alleged document falsification and control evasion. These errors necessitate a new trial on the FCPA Counts.

First, a new trial is required because the guilty verdicts for the FCPA Counts were almost certainly premised on co-conspirator *Pinkerton* liability. *Pinkerton* liability requires a valid conspiracy, and as set forth above, the jury was incorrectly instructed that it could find a conspiracy to commit *legal* conduct. Without a conspiracy, *Pinkerton* liability cannot be a basis for the jury's verdict. *United States v. Yates*, 16 F.4th 256, 262 (9th Cir. 2021) ("Without a conspiracy, the false-entry counts cannot stand because the jury may have based its verdict on those counts on a theory of co-conspirator liability."); *United States v. Stott*, 245 F.3d 890, 909 (7th Cir.) (finding *Pinkerton* liability could not apply to defendant who was not convicted of participation in a conspiracy), *amended on reh'g in part*, 15 F. App'x 355 (7th Cir. 2001).

20

Here, the jury was instructed that *Pinkerton* liability could serve as a basis for liability for the FCPA Counts. (Dkt. 249 at 48–49 (Instr. No. 44).) In fact, the Government has conceded that *Pinkerton* liability may have been the basis for *all* of the FCPA convictions. (*See* Dkt. 325 at 74 (Pramaggiore); *id.* at 78 (McClain); *id.* at 80 (Hooker); *id.* at 81 (Doherty).) The evidence adduced at trial strongly suggests that the FCPA convictions were based solely on co-conspirator conduct. For example, the Government offered no evidence that Mr. McClain was aware of the existence of, or ever saw, any of the allegedly falsified ComEd documents. (*See* Trial Tr. 2599:18-2600:4 (Marquez testifying McClain had no "role whatsoever in the creation, review, or use of [] internal ComEd forms.").) Similarly, the Government introduced no evidence that Mr. Hooker ever saw, signed, or had any knowledge of the allegedly falsified documents. The FCPA Counts concern documents dated 2017 and later. (*Id.* at 2620:5-19; 2625:23-2626:4; Indictment 44 ¶¶ 1-2, 45 ¶¶ 1-2, 48 ¶¶ 1-2.) But the evidence showed that Mr. Hooker retired from ComEd in March 2012 and thereafter lacked the authority to hire lobbyists or sign their contracts. Recognizing this might be a problem for the jury, the Government specifically pointed out that they could convict Mr. Hooker based on conspiracy and *Pinkerton* liability. (Trial Tr. 5220:15-25, 5221:1-9.) The evidence also showed Ms. Pramaggiore left ComEd before the June 2018 and March 2019 contract amendments charged in Counts Seven and Nine ever took place. (*See* Dkt. 245, Parties' Stipulation No. 7; Trial Tr. 2406:16-2407:5.) There was no evidence she saw those contract amendments. Nor did she see the contracts charged in Counts Three and Four or discuss them with anyone. (*See* Gov. Ex. 764 at EXE00002611; Gov. Ex. 868 at EXE00002359; *see also* Dkt. 264 at 26.) And there was no evidence of Mr. Doherty's knowledge of ComEd's internal accounting processes, procedures, or internal documents. Mr. Doherty submitted contracts at the requests of ComEd employees and in the manner dictated by ComEd

employees who had knowledge of the subcontractors and were not part of the alleged conspiracy. The fact that each Defendant had no involvement in at least some of the falsified documents, yet all were convicted of the FCPA Counts, strongly suggests that *Pinkerton* liability was the basis for such convictions.

If there was any remaining doubt that *Pinkerton* liability was the basis for the FCPA convictions, the jury's own question dispels it. On the same afternoon that it reached a verdict, the jury asked, "If on instruction page 43 you don't believe the government proved 'beyond reasonable doubt,' can page 48 of the instructions still be applied? Yes or no?" (Trial Tr. 5516:17-20.) Instruction 43 explained the FCPA counts and Instruction 48 was the *Pinkerton* instruction. (*Id.* at 5516:21-22.) The jury's question demonstrates that at least some jurors did not believe that the Government had provided non-*Pinkerton* liability on the FCPA counts. The Court instructed the jury to reread the instructions carefully, and the jury reached uniform guilty verdicts less than two hours later. Because the conspiracy conviction cannot stand based on instructional errors to both the Grand Jury and petit jury, *see supra* at 15–16, *Pinkerton* liability cannot properly attach, and the convictions for the FCPA Counts must be vacated.

Second, as described above, *see supra* at 11–12, the FCPA Counts must be dismissed because the Government intertwined them with accusations of violations of § 666. By explicitly tying the FCPA Counts to the language of § 666, the Government premised both the falsity of the documents and the motive of Defendants in allegedly falsifying those documents on a violation of § 666. But the jury was told that Defendants violated § 666 on two theories of commission that the Supreme Court has concluded *are not criminal*—gratuities and non-*quid pro quo* "bribery." The jury's verdict on the FCPA Counts was therefore tainted by the same foundational errors that infect the Bribery and Conspiracy Counts. That is, if there was no corrupt intent to

bribe Mr. Madigan, the documents cannot be false for failing to disclose a corrupt intent to commit bribery. The FCPA Counts are hopelessly intertwined with the faulty Bribery Counts, and a new trial is required.

Third, Defendants suffered substantial spillover prejudice by being tried on the FCPA Counts alongside the invalid Bribery Counts. Courts have ordered a new trial on surviving charges when the dismissed charges permitted the admission of inflammatory and prejudicial evidence which would not have come in had the trial involved only the surviving charges. *See, e.g.*, *United States v. Abdelaziz*, 68 F.4th 1, 12, 74 (1st Cir. 2023) (remanding for new trial); *United States v. Bruno*, 383 F.3d 65, 81, 92 (2d Cir. 2004) (remanding for new trial); *United Sates v. Aldrich*, 169 F.3d 526, 529 (8th Cir. 1999) (remanding for new trial); *see also Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 485 (7th Cir. 2000). Such "[p]rejudicial spillover occurs when evidence related to dismissed counts is used to obtain a conviction on the remaining charges." *United States v. Rodvelt*, 2023 WL 6620196, at *1 (D. Or. Oct. 11, 2023).

Such prejudicial spillover occurred here. The Government introduced extensive inflammatory evidence unrelated to the FCPA Counts to prove up its bribery and conspiracy counts. Some of the evidence the Government introduced at trial negatively reflected on Defendants generally, while the bulk of the Government's non-FCPA evidence argued—legally incorrectly as the Supreme Court has now confirmed—that Defendants had been involved in a multi-year criminal conspiracy. The cumulative effect of this non-FCPA evidence, which occupied the majority of the seven weeks of trial, inevitably affected how the jury viewed Defendants when it came time at the end of the trial—and also, apparently, at the end of jury deliberations—to turn to the FCPA counts. That spillover was so extreme in this case that the FCPA convictions cannot be said with any credibility to stand on their own, untainted by the

Government's legally incorrect arguments and the trial court's legally incorrect jury instructions.

The evidence introduced by the Government that reflected negatively on Defendants, unrelated to the allegations in the Indictment, included surreptitious recordings of calls between Mr. Madigan and Mr. McClain where the two suggest no more women are needed in the state house (*see* Gov. Ex. 101-T at 3:127-4:149) and discussed pushing a state representative out of office (*see, e.g.*, Gov. Ex. 98-T at 3:117-126; Gov. Ex. 100-T at 1:23-25). There was testimony by a Government witness who had worked for ComEd that he demanded of Mr. Madigan that he receive more money, and Mr. Madigan's alleged reply that he would "work on that." (Trial Tr. 3652:16-3654:24.) Evidence concerning the hiring of individuals and firms other than the subcontractors paid through Mr. Doherty's firm, including an appointee to ComEd's advisory board and a law firm supposedly favored by Mr. Madigan, was likewise highly prejudicial. The FCPA Counts were based solely on documents concerning subcontractors, so these hires had no relevance to those counts. Even further attenuated was the evidence of hires considered but not made, such as Mr. Madigan's chief of staff who was neither hired nor alleged to be a Madigan recommendation. (*Id.* at 2307:18-2311:4; *see* Gov. Ex. 50-T; Gov. Ex. 53-T.)

Other inflammatory evidence unrelated to the FCPA Counts included evidence of Defendant McClain's long personal and political relationship with Mr. Madigan and of Mr. Madigan's political power and the allegedly heavy-handed way in which he exercised that power. (*See, e.g.*, Trial Tr. 563:22-565:7, 565:19-25, 618:7-22, 810:15-23, 933:21-934:13, 1563:6-10, 4049:14-19, 5138:13-20.) That the jury that convicted Defendants of the FCPA Counts was also exposed to weeks of such negative evidence unrelated to the FCPA allegations can neither be denied nor said to have had no effect upon their verdict on the FCPA Counts.

The jury's conviction of *all* Defendants of *all* counts also demonstrates prejudicial

spillover. The Seventh Circuit views mixed verdicts as an indicator that the jury did not conflate evidence across different charges but instead "sort[ed] through each count individually." *United States v. Davis*, 724 F.3d 949, 956–57 (7th Cir. 2013) (finding no spillover prejudice where jury acquitted on some counts while convicting on others); *United States v. Stillo*, 57 F.3d 553, 557–58 (7th Cir. 1995) (finding no prejudicial spillover where "the jury amply demonstrated its ability to sift through the evidence with particularity" when it returned a verdict finding defendant liable only for some of the counts). Here, the across-the-board convictions of all Defendants on all counts provide no reassurance the jury engaged in such compartmentalization.

"One reliable measure of whether evidence can be considered inflammatory or unfairly prejudicial is 'whether the evidence on the reversed count[s] would have tended to incite or arouse the jury into convicting the defendant on the remaining counts.'" *United States v. Correia*, 55 F.4th 12, 38 (1st Cir. 2022). Typically, financial-record evidence used to prove fraud is "dry as dust" as compared to other evidence in trials for public corruption which collaterally involve financial fraud. *See id*. That contrast is evident here: the bribery and conspiracy charges, not the FCPA charges, were the cause of a seven-week trial involving secret tape recordings, Springfield witnesses testifying on the inner workings of the statehouse, and significant media attention. A trial only about whether certain individuals falsified internal documents and circumvented accounting controls would have been "dry as dust." *Id*. Basic fairness requires a new trial on the FCPA Counts if the bribery convictions are vacated or overturned.

## CONCLUSION

Defendants respectfully request that they be acquitted of all counts, alternatively that the Indictment be dismissed as to any remaining counts, and further alternatively that the convictions on any remaining counts be vacated for retrial.

25

DATED: August 27, 2024

Respectfully submitted,

/s/ *Patrick J. Cotter*
Patrick J. Cotter
GREENSFELDER, HEMKER & GALE, P.C.
200 West Madison Street, Suite 3300
Chicago, IL 60606
Telephone: (312) 345-5088
pcotter@greensfelder.com

David P. Niemeier
GREENSFELDER, HEMKER & GALE, P.C.
10 South Broadway, Suite 2000
St. Louis, MO 63102
Telephone: (314) 241-9090
dpn@greensfelder.com

*Attorneys for Defendant Michael McClain*

/s/ *Jacqueline S. Jacobson*
Michael D. Monico
Barry A. Spevack
Jacqueline S. Jacobson
MONICO & SPEVACK
53 West Jackson Blvd., Suite 1315
Chicago, IL 60604
Telephone: (312) 782-8500
mm@monicolaw.com
bspevack@monicolaw.com
jjacobson@monicolaw.com

Susan Pavlow
53 West Jackson Blvd., Suite 1550
Chicago, IL 60604
Telephone: (312) 322-0094

*Attorneys for Defendant John Hooker*

/s/ *Scott R. Lassar*
Scott R. Lassar
Daniel C. Craig
Jennifer M. Wheeler
Emily R. Woodring
Joan E. Jacobson
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
slassar@sidley.com
dcraig@sidley.com
jwheeler@sidley.com
ewoodring@sidley.com
joan.jacobson@sidley.com

*Attorneys for Defendant Anne Pramaggiore*

/s/ *Gabrielle R. Sansonetti*
Michael P. Gillespie
GILLESPIE AND GILLESPIE
53 West Jackson Blvd., Suite 1062
Chicago, IL 60604
Telephone: (312) 588-1281
michael@gillespieandgillespielaw.com

Gabrielle R. Sansonetti
LEINENWEBER, DAFFADA, &
SANSONETTI
120 N. LaSalle Street, Suite 2000
Chicago, Illinois 60602
(773)716-6117(c)
gabrielle@ilesq.com

*Attorneys for Defendant Jay Doherty*